## IN THE UNITED STATES BANKRUPTCY COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| IN RE:  Carlene P Wyche | CHAPTER THIRTEEN |
|---|---|
| Debtor | Case Number 22-12076-amc |

## MOTION FOR RELIEF FROM AUTOMATIC STAY TO PERMIT

### ORDER GRANTING RELIEF FROM STAY

The Motion of Petitioner, The Galman Group on  requesting Relief from the Automatic Stay provided for by Section 362(a) of the Bankruptcy Code is GRANTED.

It is further ORDERED that Petitioner is Granted leave to proceed with an action for possession of the property and/or eviction of the Debtor.

BY THE COURT

_____
                                 J.

Notices sent to:

Carlene P. Wyche
7810 Algon Avenue, Apt. A201
Philadelphia, PA 19111

Kennwth E. West
Office of the Chapter 13 Standing Trustee
1234 Market Street - Suite 1813
Philadelphia, PA 19107

United States Trustee
Office of U.S. Trustee
Robert N.C. Nix Federal Building
900 Market Street
Suite 320
Philadelphia, PA 19107

# IN THE UNITED STATES BANKRUPTCY COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE:  Carlene P Wyche | CHAPTER THIRTEEN |
| Debtor | Case Number 22-12076-amc |

## MOTION FOR RELIEF FROM AUTOMATIC STAY TO PERMIT THE GLEN AT SHAWMONT TO PROCEED WITH AN EVICTION FOR
### 7810-7820 Algon Avenue Suite C-121 Philadelphia, PA 19111

Petitioner, The Galman Group, by and through their attorney, Jénel R. Marraccini, Esquire, moves this Court for an Order granting Relief From the Automatic Stay provided for by 11 U.S.C. Section 362 and in support thereof avers the following:

1. The Petitioner is the owner of the property located at 7810 Algon Avenue, Unit A201, Philadelphia, PA, 19111, APT where the Debtor resides.

2. Nikkia May is the Debtor in the above-entitled case under Chapter 13 of the Bankruptcy Code pending in this Court.

3. On August 9, 2022, the above-named Debtor filed a Petition for Relief under Chapter 13 of the Bankruptcy Code in this court.

4. Subsequent to the filing of the Petition for Relief in Bankruptcy, the Debtor has not paid rent in the following amounts to the Petitioner herein

| Date | Description | Charge | Payment | Balance |
|---|---|---|---|---|
| 09/1/22 | Rent Charge | $1,414.00 | | $1,414.00 |
| 09/6/22 | Late Fee | $75.00 | | $1,489.00 |
| 10/1/22 | Rent Charge | $1,414.00 | | $2,903.00 |
| 10/6/22 | Late fee | $75.00 | | $2,978.00 |
| 11/1/22 | Rent Charge | $1,41400 | | $4,392.00 |
| 11/6/22 | Late fee | $75.00 | | $4,467.00 |

In addition, due to Debtor's failure to pay the aforementioned post petition rent payments, Petitioner herein has had to incur $750.00 in legal fees and costs, which Debtor is responsible for in accordance with the parties' lease agreement.

5.     The Debtor does not have the means of paying her rent and the Petitioner is without adequate protection.

6.     Debtor continues to have the use of the apartment "Rent-Free" has no right to remain therein without paying rent.

WHEREFORE, Petitioner moves this Court for an Order Granting Relief from the Automatic Stay provided for by 11 U.S.C. Section 362 and permitting Petitioner to proceed with an action for possession of the leased premises.

Respectfully submitted,

COHEN MARRACCINI, LLC


/s/ Jénel R. Marraccini

BY:    _____
JÉNEL R. MARRACCINI, ESQUIRE
Attorney for Movant
660 Second Street Pike
Southampton, PA  18966
(215)887-8100

COHEN MARACCINI, LLC
JÉNEL R. MARRACCINI, ESQ.
MICHAEL ADLER, ESQ.
660 Second Street Pike
Southampton, PA 18966
Telephone No. (215) 887-8100
melissa@cohenmarraccini.com
The Glen at Shawmont Station

**HEARING DATE:  11/29/2022**
**HEARING TIME:   11:00 AM**

**IN THE UNITED STATES BANKRUPTCY
COURT FOR THE EASTERN DISTRICT OF
PENNSYLVANIA**

| | |
|---|---|
| IN RE:  Carlene P Wyche | CHAPTER THIRTEEN |
| Debtor | Case Number 22-12076-amc |

**CERTIFICATION OF PETITIONER CINDY JACKSON IN SUPPORT OF
MOTION FOR RELIEF FROM AUTOMATIC STAY**

I, Cindy Jackson certify the following:

1.      I am the Property Manager for the property located at 7810-7820 Algon Avenue

Suite C-121 Philadelphia, PA 19111, Debtor Carlene P Wyche currently resides at the Premises

under the terms of a residential lease.  A true and correct copy of the residential lease is enclosed

herewith as Exhibit A.

2.      I am familiar with Debtor's rental payment history because I am Debtor's landlord

and Debtor is my tenant.

3.      On August 9, 2022, the above-named Debtor filed a Petition for Relief under

Chapter 13 of the Bankruptcy Code in this Court.  (Docket No. 1)

4.      I am seeking relief from the automatic stay to pursue my state court rights due to

Debtor's nonpayment of rent.

5.      The amount of Debtor's rent per month *$1,414.00*

6.      At the time of Debtor's Petition for Relief in Bankruptcy, Debtor owed rent totaling $ *3,213.00* which represents unpaid rent for (2) two full month and (1) one partial month. Debtor also owed late fees totaling 75.00. Which represents late fees for (1) one full month.

7.      Subsequent to the filing of the Petition for Relief in Bankruptcy, Debtor's payment history

| Date | Description | Charge | Payment | Balance |
|------|-------------|--------|---------|---------|
| 09/1/22 | Rent Charge | $1,414.00 | | $1,414.00 |
| 09/6/22 | Late Fee | $75.00 | | $1,489.00 |
| 10/1/22 | Rent Charge | $1,414.00 | | $2,903.00 |
| 10/6/22 | Late fee | $75.00 | | $2,978.00 |
| 11/1/22 | Rent Charge | $1,414.00 | | $4,392.00 |
| 11/6/22 | Late fee | $75.00 | | $4,467.00 |

8.      Post-petition, Debtor owes rent totaling $ 4,467.00 which represents unpaid rent for three (3) full months and Three (3) late fees.

9.      Debtor's failure to pay rent is cause for relief from the automatic stay.

10.     Through this motion, I request relief from the automatic stay so I may initiate a landlord-tenant action in Municipal court seeking possession of the Premises and a Warrant of Removal of Debtor.

I certify under penalty of perjury that the foregoing statements made by me are true and correct. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Date: NOVEMBER 9, 2022

_____
Cindy Jackson Petitioner

# EXHIBIT "A"

Algon Flats



# PA LEASE CONTRACT
### CERTIFIED LEASE  PENNSYLVANIA

## PARTIES AND LEASED PREMISES

| Owner | Address | Phone |
|---|---|---|
| Algon Flats | P.O. Box 56503, Philadelphia, PA  19111-6503 | (215) 722-1175 |

| Agent | Address | Phone |
|---|---|---|
| The Galman Group | 7810-7820 Algon Avenue Suite C-121 Philadelphia, PA 19111 | (215) 886-2000 |

| Residential Community |
|---|
| Algon Flats |

| Street Address | City | State | ZIP |
|---|---|---|---|
| 7810-7820 Algon Avenue | Philadelphia | Pennsylvania | 19111 |

| Residents | Leased Premises |
|---|---|
| Carlene Wyche | A201 |

| Street Address | City | State | ZIP |
|---|---|---|---|
| 7810 Algon Avenue, #A201 | Philadelphia | Pennsylvania | 19111 |

## LEASE TERM

| Type | Length | Move-In Date | Start Date | End Date | Date Signed |
|---|---|---|---|---|---|
| ☒ Move-In  ☐ Renewal | 1 year and 22 days | 12/10/2021 | 12/10/2021 | 12/31/2022 | November 29, 2021 |

## RENT

| Payable To | Address | Phone |
|---|---|---|
| Algon Flats | P.O. Box 56503, Philadelphia, PA  19111-6503 | (215) 722-1175 |

| Office Hours | Due On | Late On | Fax |
|---|---|---|---|
| Monday - Friday 9:00am to 5:00pm; Saturday and Sunday Closed | 1st | 3rd | (    )     - |

## CHARGES

| Online Payment Chargeback | $35.00 | Late Payment | $75.00 | Dishonored Payment | $35.00 |
|---|---|---|---|---|---|
| Annual Rental Inspection/Occupancy Fee | $56.00 | | | | |

## TOTAL MOVE-IN COSTS

| Prorated Rent and Monthly Charges | $1,003.00 | Total Deposits | $1,370.00 | Total One-Time Fees | $56.00 |
|---|---|---|---|---|---|
| HOLDING DEPOSIT PAID ON 10/5/2021 | | | | | ($500.00) |
| **TOTAL DUE ON OR BEFORE MOVE-IN** | | | | | **$1,929.00** |

| MONTHLY PAYMENTS | | DEPOSITS | | ONE-TIME FEES | |
|---|---|---|---|---|---|
| Base Rent | $1,370.00 | Security Deposit | $1,370.00 | Application Fee(s) Paid $64.00 | $0.00 |
| Monthly Water/Sewer Charge | $44.00 | **TOTAL DEPOSIT** | $1,370.00 | Annual Rental Inspection/Occupancy Fee | $56.00 |
| **TOTAL MONTHLY PAYMENT** | $1,414.00 | | | **TOTAL ONE-TIME FEES** | $56.00 |

THIS RESIDENTIAL LEASE CONTRACT (this "Agreement") is made and entered into as of the **29th** day of **November**, **2021**, by and between Owner of Residential Community ("Owner") and **Carlene Wyche**, jointly and severally (hereinafter collectively "Residents"). Owner hereby leases to Residents the premises at **7810 Algon Avenue, #A201 #A201, Philadelphia, PA 19111** (the "Leased Premises"), located within **Algon Flats** (the "Residential Community"), for use exclusively as a private residence, and not for any other purpose. The Leased Premises may also include the rental of parking, storage and garage spaces, if applicable, which will be designated and included in a separate written agreement. Residents' performance of their

Initial:      1    

obligations contained in this Agreement may be guaranteed by a third party. Any third party guarantee agreements will be included with and attached to this Agreement. Owner's representatives, agents, affiliates, successors, assigns, employees, officers, and directors are hereby incorporated by reference to benefit from any and all waivers, releases, and limitations of liability made by Residents hereunder. Owner has designated the following person or entity to manage the Leased Premises on behalf of the Owner, and is authorized to act on behalf of Owner for the purpose of receiving service of process and receiving notices and demands: **The Galman Group**, **7810-7820 Algon Avenue Suite C-121 Philadelphia, PA 19111**, **(215) 886-2000**.

1.  **OCCUPANCY OF THE LEASED PREMISES.    The Leased Premises may be occupied solely by Residents.** If any person other than the Resident or Occupant occupies the Leased Premises for more than **three (3)** consecutive days or **twenty-four (24)** total days in any **two (2)** month period, such person shall be deemed to reside in the Leased Premises in violation of this Agreement. Residents acknowledge that allowing unauthorized occupants to reside in the Leased Premises shall be deemed a material and incurable breach of this Agreement, and shall entitle Owner to serve Residents with a notice terminating the tenancy.

    All changes in occupancy require Owner's prior written consent. If Owner consents to an occupancy change during the term of this Agreement, a new Residential Lease Contract or an amendment to this Agreement must be executed. Any assignment or subletting without Owner's prior written consent shall be void and may, at Owner's sole discretion, terminate this Agreement. Owner's acceptance of rent from any person, not identified as a Resident or an authorized occupant, shall be deemed to be the payment of rent on behalf of Residents and shall not constitute Owner's consent for said person to occupy or reside in the Leased Premises.

2.  **TERM.**    This Agreement shall be for a fixed lease term of **1 year and 22 days**. The initial term ("Initial Term") of this Agreement shall begin on **December 10, 2021** and end at **11:59 P.M.** on **December 31, 2022**. Thereafter, this Agreement will automatically renew for successive month to month terms unless either party provides written notice that it will not renew at least **ninety (90)** days prior to the expiration of the Initial Term or the parties execute a new Residential Lease Contract.

3.  **SECURITY DEPOSIT.**    Residents have deposited with Owner the sum of **$1,370.00**, the receipt of which is hereby acknowledged as a security deposit. All or a portion of the security deposit may be retained by Owner in the event Residents become liable for any of the charges listed below. The retention of the security deposit shall not limit Owner's right to proceed against Residents for claims and damages exceeding the amount of the security deposit. Resident is not allowed to use the security deposit to pay the rent or other charges.

    Owner may recover amounts owed by Residents from the security deposit for any lawful reason including, but not limited to, the following:

    1)  any damages or loss caused by Residents' default or breach of this Agreement;
    2)  delinquent or unpaid rent and late fees;
    3)  electricity, gas, water, sewer, stormwater, or other utility charges;
    4)  damages to the Leased Premises caused by simple negligence, intentional act, accident or inaction;
    5)  the replacement cost of fixtures or other items contained in the Leased Premises that are damaged or destroyed;
    6)  service charges;
    7)  batteries for smoke detectors or other safety devices;
    8)  unreturned, damaged or missing keys or entry devices;
    9)  replacement light bulbs;
    10) reletting expenses, delinquent fees, or unpaid deposits;
    11) the costs of rekeying or disabling unauthorized security systems and alarms;
    12) pet charges;
    13) government assessments against the Owner caused by Residents, Occupants or guests;
    14) trash removal;
    15) all costs associated with illegally parked vehicles, including removal;
    16) returned check fees;
    17) removal and storage of items left in the Leased Premises; and
    18) all costs, including attorneys' fees, related to eviction proceedings or the enforcement of this Agreement.

    If the security deposit does not cover all of Owner's loss, Residents are liable for any unsatisfied amounts.

4.  **RENT.**    Residents agree to pay to Owner, as rent for the Leased Premises, the sum of **$1,414.00** per month. If Residents' tenancy initially commences after the first (1st) day of the month, Residents agree to pay **$1,003.00**, due **December 10, 2021**, as prorated rent for the first partial month. Rent shall be paid in full and received in advance, with no grace period and without demand, on or before the **1st** day of each month in the form of **bank checks, online, money orders**. Rent and all other sums due to Owner will be payable to **Algon Flats**, **P.O. Box 56503, Philadelphia, PA**

  

**19111-6503**, **(215) 722-1175**. The usual days and hours when payments may be made personally are: **Lockbox P.O. Box 56503 Philadelphia, PA 19111**. Payments made will not be held at the request of anyone - all payments made will be directly deposited. Use of a rental payment drop box, if one is provided by Owner, is for Residents' convenience – the risk of receipt of funds by Owner when such box is used is Residents' risk, and not Owner's risk.

If in any month, rent is not paid before the **3rd** day of the month, payment must be in the form of **certified check or money order**. If Owner serves Residents with a notice to pay rent or surrender possession, any payment tendered following service of said notice must be in the form of **certified check or money order**.

    **4.1. First Payment.**    Residents shall pay the first month's rent on or before the Initial Term begins. Payment shall be in the form of **certified check or money order**. In the event Residents fail to pay the first month's rent, Owner may terminate this Agreement and shall be entitled to recover all damages suffered, including any future rent as it becomes due and other amounts subject to any mitigation of Owner's loss.

    **4.2. Online Payments.**    Residents are permitted to make rent payments via an online web-based service. Payment of rent online, while such service is provided by Owner, is for Residents' convenience - the risk of receipt of funds by Owner when such service is used is Residents', and not Owner's, risk. Furthermore, Residents hereby agree not to chargeback any rent payments made by credit card, debit card, EFT, ACH or any other electronic means to Owner. Residents shall pay Owner a sum of **$35.00** for each chargeback, as a liquidated damage. In the event of a chargeback, Residents may, at Owner's option, be required to pay the rent and applicable late charges by **certified check or money order**. If **two (2)** or more payments submitted by Residents are chargeback in any **twelve (12)** month period, Residents shall be required to pay all future rent and other charges by **certified check or money order**.

**5. LATE PAYMENTS AND FEES.**    Owner and Residents agree that it is and will be impracticable and extremely difficult to fix the actual damages suffered by Owner in the event Residents make a late payment of rent, or when Residents make a payment that is subsequently dishonored by the bank, and that the below charges represent a reasonable approximation of the damages Owner is likely to suffer from a late or dishonored payment. Owner and Residents further agree that this provision does not establish a grace period of the payment of rent, and that Owner may give Residents a written notice to pay or quit the Leased Premises in accordance with State law at any time after the payment is due. Owner shall have all remedies under the law and this Agreement in the event Residents fails to timely pay the rent or other amounts owed. At Owner's sole discretion, Owner may report any delinquent rent or other amounts owed to a credit reporting agency.

    **5.1. Late Payments.**    Residents shall pay the total amount of rent owed on or before the **1st** day of the month. If Residents fail to timely pay all rent, Owner is entitled to a late fee of **$75.00** on the **3rd** day of the month.

    **5.2. Dishonored Payments.**    Residents shall owe **$35.00** for each dishonored payment plus any applicable late fees described in this Agreement until all amounts owed are paid. Residents must resolve dishonored payments caused as a result of error by the financial institution with the financial institution. Owner is unable to waive the charge for dishonored payments or any late fees. In the event of a dishonored payment, Residents may, at Owner's option, be required to pay the rent and applicable late charges by **certified check or money order**. If **two (2)** or more payments submitted by Residents are, for any reason whatsoever, dishonored by the financial institution upon which it is drawn in any **twelve (12)** month period, Residents shall be required to pay all future rent and other charges by **certified check or money order** plus any and all costs required in the collection of said payments.

**6. PAYMENTS.**    To the extent allowed by law, Owner first may apply payments received to any unpaid amounts other than rent, irrespective of any written or verbal requests by the Residents or when the charges may have accrued.

**7. RENT INCREASES AND LEASE CONTRACT CHANGES.**    Owner may notify Residents in writing of any increase in rent five (5) days before the final date that Residents are required to give their move out notice. The new rent amount shall take effect on the date stated in the notice and after the current lease term expires. Owner may deliver the notice of an increase in rent via email or other electronic messaging service. Residents are not required to sign the written notice of rent increase or other documents for the new rent amount to take effect.

**8. COMPLIANCE WITH RULES, LAWS, AND REGULATIONS.**    Residents hereby acknowledge receipt of a copy of the Residential Community's Policies and Rules (the "Rules"), which are incorporated into and made a part of this Agreement. Residents agree to abide by said Rules in all respects. Owner may make reasonable changes to the Rules upon providing thirty (30) days written notice to Residents, and Residents agree to abide by such changes if they are distributed and applicable to the Residential Community and do not change the rent. Failure to comply with the Rules shall be deemed a breach of this Agreement.

Residents agree not to harass, annoy, or endanger any other resident or person, or create or maintain a nuisance, or disturb the peace or solitude of any other resident, or commit waste in or about the Leased Premises. Residents are responsible for the conduct of any members of their household, Occupants, or guests while present at the Residential Community. Residents further agree not to harass, verbally abuse, denigrate or otherwise disrespect Owner's employees,

 Initial:     3    

agents and/or contractors or interfere with Owner's business operations. Failure to abide by this policy may result in the termination of this Agreement.

Certain acts are considered to be contrary to the safety, well-being, peace, and enjoyment of the other residents of the Residential Community, and therefore, will be considered to be a breach of this Agreement. These include, but are not limited to: 1) violations of this Agreement, the Rules, or applicable fire, safety, health, or criminal laws, ordinances, or regulations; 2) Residents or occupants giving incorrect or false answers in a rental application; 3) Residents or any occupants being convicted or given deferred adjudication or pretrial diversion for an offense involving actual or potential physical harm to a person, or involving manufacture, or delivery of a controlled substance, or drug paraphernalia in violation of applicable law, or any sex-related crime, including a misdemeanor; and 4) any illegal drugs or paraphernalia are found in the Leased Premises.

9.  **MULTIPLE RESIDENTS OR OCCUPANTS.**    Residents will be in material breach of this Agreement if any Resident, Occupant, or guest (whether invited or uninvited) violate any of the terms of this Agreement or the Rules. Residents are jointly and severally liable for all obligations arising under this Agreement whether or not they remain in actual possession of the Leased Premises. Notices or demands from Owner that are served upon any Resident, Occupant or guest are deemed validly served upon all Residents. Each Resident agrees and is deemed to be an agent for service of process for all other Residents in eviction proceedings.

   **9.1.  Replacements and Subletting.**    Without the prior written approval of Owner, replacing Residents or subletting the Leased Premises is strictly prohibited. A replacement of Residents or sublease will be subject to the Owner's policies and underwriting requirements, reimbursement of Owner's expenses in connection with the replacement or sublease, and final approval by the Owner of the Residents' replacement or sublessee. Residents who are replaced or sublet the Leased Premises will continue to be liable for all of Residents' obligations of this Agreement. Replaced Residents and Sublessors relinquish their rights to a refund of the security deposit, and their right to possess or otherwise occupy the Leased Premises. Any attempt to replace any Residents or sublet the Leased Premises without Owner's prior written consent will be void. Residents shall not assign this Agreement.

10. **USE OF LEASED PREMISES AND COMMON AREAS.**    Residents shall not do or permit anything to be done in or about the Leased Premises that will in any way obstruct or interfere with the rights of other residents or occupants of the building or injure or annoy them or use or allow the Leased Premises to be used for any improper, unlawful, or objectionable purpose. Further, Residents shall not cause, maintain, or permit any nuisance in, on, or about the Leased Premises, or commit any waste in or on the Leased Premises, and shall promptly notify Owner in writing of any defective or potentially defective conditions, in the Leased Premises, or in the Residential Community. Finally, Residents shall not put the Leased Premises to any use that violates local zoning ordinances or any other law applicable to the Leased Premises. Residents agree to reimburse and indemnify Owner for all fines or other penalties incurred by Owner as a result of the violation of any statute, ordinance, regulation or other governmental restriction by Residents or any members of their household, Occupants, or guests. Nothing set forth herein shall be deemed as disallowing any use of the Leased Premises that cannot legally be prohibited.

Residents further agree to the following: 1) Residents must keep the Leased Premises and areas reserved for private use clean and sanitary; 2) trash must be disposed of at least weekly in appropriate receptacles; 3) passageways may be used only for entry or exit; 4) amenity areas must be used with care in accordance with the Rules and posted signs; 5) glass is prohibited in all common areas; 6) conducting business of any kind in the Leased Premises or the Residential Community is prohibited without Owner's prior written consent--any lawful business conducted at home by computer, mail, or telephone is permissible if permitted by local zoning ordinance and customers, clients, patients, or other business associates do not come to the Leased Premises for business purposes; 7) businesses allowed in a home by state or local statute or ordinance will be permitted with proper licensing and notification provided to the Owner in advance of the operation of the business; 8) Owner may exclude from the Residential Community guests or others, who in Owner's judgment, have been violating the law, violating this Agreement or any community rules, which includes anyone who is disturbing other residents, neighbors, visitors, or Owner's representatives; 9) Owner may also exclude from any outside area or common area anyone who refuses to show identification or identify themselves as a guest, occupant or resident in the Residential Community; 10) Residents agree to notify Owner if Residents or any occupants are convicted of a felony, offense involving a controlled substance, violence to another or destruction of property or if any of the above register as a sex offender in any state; and 11) Residents will not keep or store hazardous or combustible materials on the Leased Premises. Any violation of these provisions shall be deemed a material and incurable breach of this Agreement and shall entitle Owner to evict the Residents.

11. **LEASED PREMISES AND FURNISHINGS.**    Residents acknowledge that Residents have inspected the Leased Premises. Residents acknowledge that the Leased Premises are in a clean and good condition including painted surfaces, carpets, flooring, all furniture, furnishings, fixtures, equipment and appliances. It shall be conclusively presumed that said Leased Premises and all items, appliances and fixtures contained therein are in good working condition, unless Residents deliver a contrary statement in writing to Owner prior to or on the starting date of this Agreement. Residents

 



agree to diligently maintain the Leased Premises, be responsible for the proper care of any and all furniture, furnishings, fixtures, appliances and equipment therein, and to keep the Leased Premises in a neat and clean condition. Residents promise to return the Leased Premises and all furniture, furnishings, fixtures, equipment and appliances to Owner in the same condition at the time Residents vacate the Leased Premises as when first rented, less normal wear and tear. Residents further acknowledge that the smoke detector and/or carbon monoxide detector is operable and it is the responsibility of Residents to maintain the smoke detector and/or carbon monoxide detector in accordance with law and the manufacturer's recommendations. Residents must promptly report non-functional smoke and/or carbon monoxide alarms to Owner so repairs can be made.

All appliances are installed per manufacturers' specifications and may be anchored. Residents shall not move, un-hook, or relocate any appliance connected to a gas/water source or floor drain connection at any time. Residents agree to promptly notify in writing (service request form) or by electronic notification to Owner of any defects, dilapidations, dangerous conditions, or other needed repairs as said conditions become evident. Residents agree to immediately reimburse Owner for any sums incurred by Owner to repair the Leased Premises or any item, fixture, appliance or appurtenance damaged by the misuse or neglect of Residents or any members of their household, Occupants, or guests. This Agreement may not be terminated due to interruption of any service, including necessary repairs, beyond the control of the Owner, unless otherwise required by law.

    **11.1.  Freezing Weather Conditions.      For the purpose of preventing broken pipes and other damages, Residents agree that for the duration of any freezing weather conditions, Residents will maintain the temperature of the Leased Premises at <u>sixty (60)</u> degrees Fahrenheit, leave all closet and cupboard doors open (which allows more heat to reach pipes), and set all water faucets to drip. Residents will be liable for any damages that result from Residents' failure to perform the responsibilities listed in this Section.**

12. **UTILITIES.**      Owner agrees, at Owner's expense, to furnish the following utilities to the Leased Premises: **Trash**. Residents agree to pay all charges (including utility deposits) not supplied by Owner, assessed by the utility provider (or Owner, or Owner's designated Billing Party) in connection with Residents' use of utilities during the term of this Agreement, or the period of occupancy by the Residents, whichever is longer. Residents agree to pay the utility bills for which they are responsible and ensure that utilities remain connected for the duration of the Initial Term or any renewal period. Residents shall properly use all electrical, gas and plumbing fixtures and appliances only for their intended purposes. Residents shall not install or operate any additional equipment or appliance, including, but not limited to, portable generators, additional refrigerators and freezers, a dishwasher, washing machine, clothes dryer or an air conditioning unit in the Leased Premises unless supplied by Owner or with Owner's prior written approval. Residents will be responsible for the following utilities: **Buildings A, C & D - Electric, Cable, Water/Sewer. Building B - Electric, Cable, Water/Sewer and Gas**.

Owner may modify the method by which the utilities are furnished to the Leased Premises or billed to Residents during the term of this Agreement. In the event of interruption or failure of utility services that Owner is required to furnish, Owner shall use reasonable diligence in its efforts to restore such services. Owner shall not be liable for any damages directly or proximally caused by interruption or failure of utility service unless such interruption or failure of utility service is solely due to Owner's failure to pay to the service provider for the provision of such services to the Leased Premises. With prior notice to Residents Owner may terminate or prorate, as provided by applicable law, electricity furnished at Owner's expense if Residents rent is delinquent.

Owner reserves the right, at any time a past due balance is owing on the utilities, to apply any and all funds received from the Residents, including funds paid as rent, first to the past due balance and then any remaining funds will be applied to Rent. Residents agree to this allocation of funds despite any limiting or restrictive endorsement contained on the payment. Further, if Residents fail to pay any utility charges that are to be paid by Residents, Owner may, at its option, pay such charges in full to retain continuing utility services and bill Residents such charges as additional rent together with the regular monthly rental payment on the **1st** day of the month next following the date of such billing. When the Residents move from the Leased Premises, the utility charges will be charged to and deducted from the security deposit. It is understood and agreed between Owner and Residents that in the event submetered or allocation payments are not made when due, it shall be considered a default under this Agreement.

13. **DAMAGES, ALTERATIONS AND REPAIRS.**      Residents agree not to destroy, damage, deface or remove any part of the Leased Premises or Residential Community or permit any persons or animals to do so and to assume all liability for damages other than ordinary wear and tear. Residents shall make no alterations to the Leased Premises without the prior written consent of Owner. Any alteration made to the Leased Premises by Residents after that consent has been given, and any fixtures installed as a part of that work, will at Owner's option become the Owner's property on the expiration or earlier termination of this Agreement, provided, however, that Owner shall have the right to require Residents to remove any fixtures at Residents' cost on termination of this Agreement. Residents shall notify Owner of any dilapidations or other defective conditions on the Leased Premises that require repairs. Residents agree not to install additional or different locks, gates or alarms on any doors or windows of the Leased Premises without written permission of Owner. If Owner



approves Residents' request to install such mechanisms, Residents agree to provide Owner with a key for each lock.

**EXCEPT IN CASES OF EMERGENCIES OR FAIR HOUSING ACCOMMODATIONS, ALL NOTICES FROM RESIDENTS OR OCCUPANTS TO OWNER REGARDING REPAIRS, SERVICES, OR SECURITY MUST BE SIGNED BY RESIDENTS OR OCCUPANTS AND PROVIDED TO OWNER IN WRITTEN OR ELECTRONIC FORM ONLY, AS SPECIFIED BY OWNER.** Verbal requests from Residents, as well as written notes by Owner, Owner's employees, or agents will not be considered proper notice under this provision, and Owner's compliance with Residents' verbal requests does not constitute waiver of the strict requirements of this Section. Incidents constituting emergencies include situations where persons or property are in danger of imminent harm, such as fire, smoke, flooding water or active criminal activity. Residents must immediately notify Owner of any repairs, service issues, or security issues in the Leased Premises or at the Residential Community. Owner may terminate this Agreement upon reasonable notice to Residents if the Leased Premises are substantially damaged or the performance of services or repairs creates a danger to Residents, and Owner may remove Residents' personal property if it poses a safety or health hazard. Owner may temporarily interrupt services as needed to prevent property damage or perform repairs, which will not constitute a reduction in services entitling Residents to an abatement of rent, unless required by law.

14. **RISK OF LOSS OF RESIDENTS' PROPERTY.**    Residents shall bear the risk of loss of any and all of Residents' personal property whether located in the Leased Premises, in garage/carport, designated storage areas or anywhere within the Residential Community. Residents agree not to hold Owner, its agents and/or employees liable in any manner for or on account of any loss or damages sustained by reason of the acts or omissions of third parties, or arising from any casualty (including but not limited to fire, smoke, rain, flood, water and pipe leaks, mold, hail, ice, snow, lightning, wind, explosions, earthquake, interruption of utilities, theft, hurricane, negligence of other residents, occupants, or invited/uninvited guests or vandalism, unless otherwise required by law). Residents understand and agree that Residents, any members of their household, Occupants, or guests are not beneficiaries of any insurance policies held by the Owner or the Owner's agents. Residents are required to purchase and maintain personal liability insurance with a coverage limit of no less than **$100,000.00** for the Initial Term and any renewal periods and provide a copy thereof to Owner. Residents will be in material breach of this Agreement if they fail to comply with the requirements of this provision.

15. **ANIMALS.**    No animals are permitted without the prior written consent of Owner. Any such consent may be revoked at any time, with or without cause, by giving **three (3)** days written notice to Residents. Except to the extent written permission is given, animals may not be brought upon the Leased Premises, whether such animals belong to Residents or to any other person. The presence of any animals as to which permission has not been given and is not currently in force, even if such animals are "just visiting," shall be deemed a material and incurable breach of this Agreement and shall be cause for the service of a notice terminating the tenancy. Service or support animals are not subject to these provisions. However, Owner may require a written statement from a qualified professional verifying the need for the service or support animal.

16. **HOLD HARMLESS FOR GUESTS.**    Residents agree to defend, protect, indemnify, and hold harmless Owner and Owner's agents against and from any and all claims, suits, liabilities, judgments, costs, demands, causes of action, and expenses, brought by Residents' Occupants, guests, or any other person in the Leased Premises with Residents' permission. If any action or proceeding is brought against Owner or Owner's agents by reason of any such claim, upon notice from the Owner, Residents shall defend the same at Residents expense by counsel reasonably satisfactory to Owner.

17. **DELIVERY OF LEASED PREMISES.**    If, for any reason, Owner is unable to provide occupancy to Residents by the scheduled first day of the Initial Term, this Agreement will continue to be in effect, and Residents' may elect one of the following remedies: a) a prorated daily abatement of rent until the date that Owner delivers possession of the Leased Premises; or b) Residents may terminate this Agreement up until such time as Owner delivers possession. Owner will have no liability to Residents if there is a delay of possession other than to refund any amounts paid to Owner under this Agreement. Residents' failure to take occupancy of the Leased Premises due to issues of cleanliness, repairs, or services, does not constitute a failure of Owner to deliver possession of the Leased Premises.

18. **RESPONSIBILITIES OF OWNER.**    Owner will act with customary diligence in keeping common areas reasonably clean; maintaining fixtures and appliances; complying with applicable safety, sanitation, and fair housing laws; and making reasonable repairs, subject payment by Residents for damages they are liable for.

    18.1. **Security.**    Owner makes no representations or guarantees to Residents concerning the security of the Leased Premises or the Residential Community. Owner is under no obligation to Residents to provide any security measure or take any action not required by statute. The presence of courtesy patrols, patrol cars, access gates, surveillance cameras or other deterrents do not guarantee that crime can or will be prevented. All such systems are subject to personnel absenteeism, human error, mechanical malfunctions and tampering. Residents are responsible for planning and taking action with respect to the safety of Residents and their property as if such systems and deterrents did not exist. Residents agree to immediately report all suspected or actual criminal activity to the appropriate local law enforcement agencies and, after doing so, to Owner, and shall provide Owner with such law enforcement agency's

  

incident report number upon request.

Owner has no obligation to obtain criminal background checks on any Residents and bears no responsibility or liability related to the criminal background or actions (whether past, present or future) of any person, even if Owner has actually run a criminal background check on applicants. Residents shall not rely on the fact that Owner may have run a criminal background check on Residents or any other applicant when deciding whether to enter into this Agreement. Background checks are not a guarantee that a person with a criminal background does not reside at the Residential Community. Owner has not made and does not make any representations as to the background of any existing or future resident and Owner is under no obligation to run background checks on any existing resident or future applicant.

19. **ACCESS.**      Owner may enter the Leased Premises under the following circumstances: 1) in case of emergency; 2) to make necessary or agreed repairs, decorations, alterations, or improvements; 3) to supply necessary or agreed services; 4) to exhibit the Leased Premises to prospective or actual purchasers, mortgagees, tenants, workers, or contractors; 5) if Residents abandon or surrender the Leased Premises; 6) pursuant to court order; 7) to perform an inspection of the Leased Premises; or 8) under any other circumstances permitted by state law. Owner will give Residents at least **twenty-four (24)** hours notice of Owner's intent to enter unless: a) an emergency exists; b) Residents have abandoned or surrendered the Leased Premises; or c) it is impracticable to do so. Further, Owner will enter only during regular business hours unless: i) an emergency exists; ii) Residents have abandoned or surrendered the Leased Premises; or iii) Residents consent, at the time of an entry that is not during normal business hours, to the entry. Residents agree that if they deny Owner access to the Leased Premises when Owner is in compliance with statutory requirements and entitled to access, any such denial of access shall be deemed a material breach of this Agreement and shall entitle Owner to evict the Residents.

20. **TERMINATION, DEFAULT AND REMEDIES.**      Owner and Residents agree that all provisions, obligations, and conditions of this Agreement are reasonable and material and that a breach by Residents of any such provision, obligation, or condition constitutes a material breach thereof. Owner is entitled to all rights, remedies, and damages under this Agreement and by law, including, but not limited to, all rights and remedies for damages to the Leased Premises, past and future rent due, all legal fees, court costs, collection agency fees, sheriff's fees, moving and storage costs, other amounts due under this Agreement, and other costs incurred in evicting the Resident and collecting what is owed. All right and remedies provided in this Agreement and by law are cumulative. This Agreement shall be deemed terminated upon written notice of termination by Owner to Residents or by the filing of an eviction complaint. No other action by Owner shall constitute termination, including, but not limited to: a) maintenance of the Leased Premises by Owner or on Owner's behalf; b) efforts to rent out the Leased Premises by Owner or on Owner's behalf; c) Owner's withholding of consent to assign or sublet the Leased Premises pursuant to the terms of this Agreement; d) Owner's termination of a sublet or assignment of the Leased Premises pursuant to the terms of this Agreement; or e) actions by Owner to procure the appointment of a receiver to secure Owner's interests under this Agreement. In the event of a breach by Residents, or where required by state law, Owner may provide to Residents written notice of the breach and demands for cure. Owner may terminate this Agreement if a cure is not possible or if Residents do not cure the breach within the time period provided by the notice or state law.

     **20.1.  Waiver of Notice.**      If the Owner desires to start a Court action to recover possession for nonpayment of rent or for any other reason, Residents' specifically waive any notice period contained in the Landlord Tenant Act of 1951, as amended, or any other notice period established by law. **THEREFORE, THE OWNER MAY FILE SUIT AGAINST THE RESIDENTS WITHOUT NOTICE IF THE RESIDENTS BREACH THIS AGREEMENT, AND RESIDENTS AGREE THAT NO NOTICE IS REQUIRED.**

21. **MOVE-OUT NOTICES AND PROCEDURES.**      Prior to moving out, Residents are required to provide Owner with advance written notice. The move out notice must comply with the notice provision of this Agreement and provide Resident's move out date. Residents must obtain written acknowledgment from Owner of receipt of Residents' move out notice. If Owner terminates this Agreement, Owner will provide Residents with the same notice unless Residents have breached the terms of this Agreement. Oral move out notice is not an acceptable form of termination. The move out date provided for in the notice cannot be changed without additional written agreement signed by both parties. Each Resident must provide Owner with their forwarding address in writing. A move out notice does not release Residents from liability under the full term or any renewal terms of this Agreement except where Resident moves out pursuant to a Military Personnel Release or if Owner and Resident agree to such release in a written amendment signed by both parties. Residents may not withhold any portion or last month's rent under the assumption that the security deposit will cover rent due. Early move out by Residents may also result in reletting expenses.

Residents, Occupants, and guests must vacate the Leased Premises on or by the agreed upon move out date, the date contained in Resident's move out notice, or Owner's notice to vacate. Owner may pursue action for possession for any hold over after expiration of the term of this Agreement or its termination, without the consent of Owner. Additionally, Residents will be liable for hold over rent, which will be equal to twenty five percent (25%) over the then existing rent, plus rent for the full term of a lease signed by a new resident, prior to Residents' hold over, who is unable to occupy the

  

Leased Premises because of Residents' hold over.

    **21.1.** **Cleaning.**    Prior to moving out, Residents are required to clean all areas of the Leased Premises, including but not limited to, living and dining rooms, kitchens, hallways, bedrooms, closets, bathrooms, floors, outdoor walkways, patios, balconies, and any leased or assigned parking or storage areas. Residents must also comply with move out and cleaning instructions provided by Owner. If, at Owner's discretion, Residents fail to adequately clean the Leased Premises, Owner reserves the right to hire a professional cleaning service and Residents will be liable for reasonable cleaning expenses.

**22. RESIDENTS' PERSONAL PROPERTY.**    Residents shall vacate and remove all personal property from the Leased Premises upon expiration or termination of this Agreement without further notice or demand from Owner. Owner may remove and dispose of Residents' personal property in a manner permissible by state law upon termination or expiration of this Agreement, surrender, abandonment, or court ordered eviction of Resident.

**23. SECURITY DEPOSIT RETURN.**    Owner will mail the security deposit, less any lawful deductions, and an itemized list of amounts withheld no later than thirty (30) days after surrender and acceptance of the Leased Premises. Delivery of security deposit refunds and itemized deductions to any one of multiple residents shall constitute notice and delivery to all Residents.

**24. RELEASE OF RESIDENTS.**    Unless otherwise provided for by this Agreement or by law, Residents will not be released from this Agreement.

**25. MISCELLANEOUS.**    This Agreement, including all applicable exhibits, schedules, addenda, or forms, sets forth all of the promises, agreements, conditions, and understandings between Owner and Residents and may not be changed or modified except by an agreement in writing signed by all parties. Residents acknowledge that all representations and statements relied upon in executing this Agreement are contained herein and that Residents in no way relied on any other statements or representations, written or oral. This Agreement and all rights of Residents arising under it are expressly agreed to be subject and subordinate to present and future recorded mortgages which are or may be placed upon the Leased Premises and all other rights afforded to the holder of any such mortgages.

    **25.1.** **Zero Tolerance Crime Policy.**    Residents, Occupants, guests, or other individuals under Residents' control: 1) shall not engage in criminal activity or engage in any act intended to facilitate criminal activity on or near the Residential Community; 2) shall not engage in drug-related criminal activity on or near the Residential Community, including but not limited to, the illegal manufacture, sale, distribution, use, or possession with the intent to manufacture, sell, distribute, or use of an illegal or controlled substance as defined in Section 102 of the Controlled Substance Act, 21 U.S.C. § 802; 3) shall not facilitate, use, or permit the Leased Premises to be used for criminal or drug-related criminal activity; and 4) shall not engage in any illegal activity which might negatively affect the health, safety, or welfare of the Owner, Owner's agents, other residents, the Leased Premises, or the Residential Community. Owner and Residents agree that these provisions are reasonable and material and that a violation by Residents of any such provision constitutes a material breach of this Agreement and is good cause for immediate termination of tenancy.

    **25.2.** **Satellite Dishes and Antennas.**    The Federal Communications Commission states that Residents have a limited right to install a satellite dish or receiving antenna within the Leased Premises. The Residential Lease Contract must be amended to incorporate requirements and restrictions prior to any installation. Residents are responsible for making sure the Leased Premises is in a location to receive the satellite signal prior to requesting permission to install. For information on requirements and restrictions, contact Owner. Resident shall not install any external media device nor climb or have others climb upon the roof.

    **25.3.** **Bedbugs.**    Bedbugs are wingless parasites which may lie dormant in cracks, crevices and personal belongings until a host is present. Residents have an affirmative duty to inspect the Leased Premises and notify Owner of the presence or infestation of insects or vermin including bedbugs within forty-eight (48) hours of the Residents taking possession of the Leased Premises. Absent this timely notice to Owner, Residents acknowledge and confirm that the Leased Premises are free of the presence or infestation of insects or vermin, including bedbugs. Residents agree to maintain the Leased Premises in a manner that prevents the occurrence of an infestation of insects and vermin including bedbugs. If Residents allow individuals or items carrying bedbugs into the Leased Premises, or have repeated infestations that cannot be traced to another source, such will be deemed damage to the Leased Premises and Residents will be responsible for the cost of treatment to the Leased Premises, personal belongings and surrounding residences as necessary to eradicate the infestation.

    **25.4.** **Attorney's Fees.**    In the event of any litigation relating to a breach of this Agreement by the Residents, the Owner in such litigation shall be entitled to its costs, including reasonable attorney's fees incurred in such litigation. An eviction action shall be considered an action relating to this Agreement and thus subject to this provision.

    **25.5.** **Sale of Leased Premises.**    In the event of a sale or pending sale of the Residential Community or in the

 

event the Owner, new owner, lender, or lender's receiver must obtain possession of the Leased Premises in order to redevelop, renovate, or demolish the Leased Premises or any portion of the Residential Community, Residents agree that the Owner, new owner, lender, or lender's receiver shall have the right to terminate this Agreement upon sixty (60) days written notice.

**25.6.  Fair Housing.**    Owner shall comply with all applicable local, state, and federal non-discrimination and fair housing laws, including laws which prohibit discrimination on the basis of race, religion, ethnic origin, national origin, color, sex, age, physical or mental disability, or family status.

**25.7.  Unpaid Balances.**    All unpaid balances bear eighteen percent (18%) interest per year from due date, compounded annually. Additionally, if Residents fail to pay all sums due as stated in the demand letter by the deadline stated in the demand letter, Residents shall be liable to pay all collection agency fees related to the collection of the unpaid balances.

**25.8.  Liquid Filled Furniture.**    Liquid filled furniture, including, without limitation, waterbeds and aquariums, is allowed only with proper insurance coverage, and prior written approval of Owner. Residents must provide Owner with at least 24-hours written notice prior to the installation, removal or movement of any liquid-filled furniture and Owner has the right to be present at the time of such installation, removal or movement. Installation movement and removal must be done in accordance with standards set by the manufacturer, retailer or state law, whichever provides the higher degree of safety. No aquariums over **ten (10)** gallons are permitted without prior written consent of the Owner. Any damages to the Leased Premises, community or other community residents' belongings as a result of leaks from liquid filled furniture will be replaced at the expense of Residents. Damages caused by the liquid filled furniture to other residents' belongings will give Owner permission to provide necessary Residents' information to all parties affected by the damage.

**25.9.  Cash is not acceptable as a form of payment. All monthly payments must be made by one (1) check not multiple checks. Partial payment of rent is not acceptable at any time; all payments must be made in full to include all amounts due. Post-dated or third party payments will not be accepted.**

**25.10.  Utility Use and Waste.**    Residents acknowledge and agree that utilities provided under this Agreement is for normal household use and must not be wasted.

**25.11.  Waiver of Jury Trial.**    To the extent permitted by law, the parties agree that any dispute arising from or related to this Agreement will be decided by a judge and not a jury.

**25.12.  Force Majeure.**    To the fullest extent permitted by law, Owner shall be excused from performance or obligations under this Agreement in the event of an act of God, epidemic, war, acts of terrorism, flood, fire, tornado, hurricane, riot, or any other event beyond Owner's control.

**26.  DISCLOSURE.**    Owner may provide information on Residents or Residents' rental history to business affiliates or upon reasonable request from an authorized agent of state or federal government or law enforcement agency.

**27.  NO WAIVER.**    Owner's failure on any occasion to require strict compliance with any provision of this Agreement or to exercise any rights arising hereunder shall not be deemed a waiver of Owner's right to subsequently enforce any such provision or to insist upon any such right. The fact that Owner may have accepted late payment(s) on one (1) or more occasions shall not be deemed a waiver of Owner's right to insist upon timely payment of rent nor to exercise any remedy available for late payment of rent. Acceptance of rent following a breach of this Agreement shall not be deemed to constitute a waiver of such breach. No custom or practice which may develop between the parties in the course of the tenancy shall be construed to waive the right of Owner to enforce any provision of this Agreement.

Owner's representatives (including management personnel, employees, and agents) have no authority to waive, amend, or terminate this Agreement or any part of it, unless in writing, and no authority to make promises, representations, or agreements that impose security duties or other obligations on Owner or Owner's representatives unless in writing. Except when notice or demand is required by statute, Residents waive any notice and demand for performance from Owner of Residents' default. Written notice to or from Owner's agents, representatives, or managers constitutes notice to or from Owner. All notices must be signed.

**28.  SEVERABILITY.**    If a provision or paragraph of this Agreement is legally invalid, or declared by a court to be unenforceable, such provision or paragraph will be deemed deleted and the rest of this Agreement shall remain in effect. To the extent that any provision of this Agreement is in conflict with any provisions of applicable law, such provision is hereby deleted, and any provision required by applicable law which is not included in this Agreement is hereby inserted as an additional provision of this Agreement, but only to the extent required by applicable law and then only so long as the provision of the applicable law is not repealed or held invalid by a court of competent jurisdiction.

**29.  ATTACHMENTS TO THE AGREEMENT.**    Residents certify that he/she/they have received a copy of this Agreement and the below listed attachments to this Agreement, and understand that these attachments are part of this Agreement.

 

Algon Flats

| | |
|---|---|
| Window Addendum | Parcel Acceptance Release Addendum |
| Damage Charges | Parking Storage Garage Addendum |
| Abandoned Personal Property | Reasonable Accommodation Policy |
| Animal Addendum | Reasonable Accommodation Request |
| Bed Bug Addendum | Resident Contact Information |
| House Rules Addendum | Restricted Animal/Breed Policy |
| Key, Permits & Access Device Addendum | Smoke Free Addendum |
| Lead Paint Disclosure | Smoking Policy Addendum |
| Mold Addendum | Utilities Addendum |

**30.  SIGNATORIES.**    This Agreement expresses the complete understanding of the parties with respect to the subject matter set forth herein and supersedes all prior proposals, agreements, representations and understandings. The undersigned Residents, whether or not in actual possession of the Leased Premises, are jointly and severally responsible for all obligations arising hereunder. This Agreement shall not be considered to be in full force and effect until signed by Owner. Owner may, without liability, refuse to enter into this Agreement and may refuse to allow Residents to occupy the Leased Premises at any time prior to signing this Agreement. Anything to the contrary in this provision notwithstanding, Residents shall be fully liable for all obligations arising hereunder, and Owner may enforce the provisions of this Agreement against Residents if, for any reason or by any means, Residents obtain occupancy to the Leased Premises before such time as this Agreement has been signed by Owner or Owner's authorized agent.

**NOTICE: RESIDENTS ARE GIVING UP CERTAIN IMPORTANT RIGHTS. RESIDENTS ARE WAIVING THE RIGHT TO RECEIVE NOTICE BEFORE OWNER COMMENCES A COURT ACTION TO RECOVER POSSESSION OF THE LEASED PREMISES FOR NONPAYMENT OF RENT OR ANY OTHER REASON. RESIDENTS ARE ALSO WAIVING THE RIGHT TO A JURY TRIAL.**

    **30.1.  Electronic Signatures.**    The parties agree that they may enter into this transaction by electronic means; although, traditional hard copies with ink signatures may be used instead at Owner's option or if required by law. Residents agree and acknowledge that if Residents are entering into this transaction with Owner by electronic means, doing so is not conditioned on Residents' agreement to conduct the leasing transaction electronically.

INTENDING TO BE BOUND, the parties hereto have executed this Agreement as of the day and year first above written.

| | |
|---|---|
| **Signed by Carlene Wyche**<br>Mon Nov 29 2021 10:30:56 PM EST<br>Key: 8D521C54; IP Address: 71.246.18.231 | **Signed by Brian Paule**<br>Tue Nov 30 2021 12:29:26 PM EST<br>Key: 517DCE7D; IP Address: 75.151.158.201 |
| Carlene Wyche *(TENANT)*                                Date | Brian Paule *(LANDLORD OR LANDLORD'S AGENT)*            Date |




Algon Flats

# WINDOW ADDENDUM

## Algon Flats

Resident:          **<u>Carlene Wyche</u>**

Apartment:      **<u>A201</u>**

Resident(s) hereby understand(s) that as a precautionary measure **The Galman Group** will do one of the following:

**a)**  Install window locks; or

**b)**  Install a window guard "catch"

**The Galman Group** advises that all Residents implement the following guidelines in order to help with the wellbeing of children around windows:

**1.**  Periodically check to make sure all window locks are in proper working order;

**2.**  Periodically check to make sure all window guard "catches" are in proper working order;

**3.**  Periodically check to make sure all screens are secure;

**4.**  Never allow children to play near open windows; and

**5.**  Refrain from placing furniture or anything near a window which would allow a child to climb up to the window.

Resident(s) understand(s) and agree(s) that it is their sole responsibility to immediately report to Management, any damaged, broken or inoperable window locks or window guards, or any other issues regarding the potential safety of any of their windows. Resident(s) assume(s) full responsibility for any injury and/or death, which may or may not result of their failure to do any of the above.

Resident(s) has/have read the above and fully understand that the above is necessary in order to protect you, your child and/or children.

---

☒ I, hereby willingly option out of all of the above for my own personal reasons and agree to Release the Landlord from any and all injuries and/or death which may or may not happen as a result of my failing to do any of the above stated.



**Signed by Carlene Wyche**
Mon Nov 29 2021 10:31:06 PM EST
Key: 8D521C54; IP Address: 71.246.18.231

**Signed by Brian Paule**
Tue Nov 30 2021 12:29:26 PM EST
Key: 517DCE7D; IP Address: 75.151.158.201

Carlene Wyche *(TENANT)*                                    *Date*    Brian Paule *(LANDLORD OR LANDLORD'S AGENT)*                *Date*



Algon Flats

# APARTMENT DAMAGE CHARGES
# APARTMENT #A201

The Management Office is responsible for normal maintenance in your apartment. All requests for service should be called to **(215) 722-1175**; for your convenience, calls are taken on a 24-hour basis. Normal service is performed **Monday through Friday between 8:30 a.m. and 5:00 p.m.**, excluding major holidays. Emergencies are handled on an "as needed" basis. Unfortunately, we cannot make appointments for repair work. If any item is damaged due to negligence on your part, **either during occupancy or when you vacate**, you will be charged according to the following schedule:

| | |
|---|---:|
| Range cleaning | $100.00 |
| Microwave cleaning | $50.00 |
| Refrigerator cleaning | $75.00 |
| Cabinets & countertop cleaning | $75.00 |
| Remove contact paper from shelves | $100.00 |
| Crisper cover | $100.00 |
| Ice cube trays (each) | $7.50 |
| Dishwasher door panel | $150.00 |
| Freezer/Refrigerator door | Full replacement cost |
| Encrusted oven & burners (flat top) | $350.00 |
| Encrusted oven & burners | $75.00 |
| Broiler pan and racks (each) | $75.00 |
| Freezer not defrosted | $50.00 |
| Kitchen light fixture | $125.00 |
| Cleaning floor | $30.00 |
| Jammed garbage disposal | $25.00 |
| Dishwasher cleaning | $50.00 |
| Improper defrosting refrigerator resulting in damages | Full replacement costs |

**Replacement of all appliances and/or parts for damages caused by Tenant will be charged at current list prices plus labor.**

| | |
|---|---:|
| Replace toilet seat | $25.00 |
| Replace bowls or tanks | $100.00 |
| Replace sink bowl | $75.00 |
| Ceramic tiles (each) | $5.00 |
| Glass shelves in the medicine cabinet (each) | $20.00 |
| Stopped toilet due to foreign object and snake out | $55.00 |
| Stopped toilet requiring removal of toilet | $100.00 |
| Bathroom cleaning | $50.00 |
| Bathroom floor cleaning | $35.00 |
| Toilet roll bar | $25.00 |
| Vanity countertops | $100.00 |
| Soap dish, towel bar, toothbrush and glass holder (each) | $25.00 |
| Medicine cabinet mirrors | $40.00 |
| Broken shower door or tub enclosure door | $75.00 |

**Lighting fixtures will be charged at current list prices.**

| | |
|---|---:|
| Mailbox lock and keys | $35.00 |
| Duplicate keys | $5.00 |
| Replacement of front door security key | $75.00 |
| Floor damages | $100.00 |

**Wall and door repairs charged according to material and labor.**

Initials: 

| Screen repairs | $25.00 |
| Door Bell replacement | $100 |

**Painting apartment charged according to current market prices.**

| Lock replacement | $35.00 |

**Cleaning entire apartment according to size.**

| Efficiency | $75.00 |
| 1 Bedroom | $100.00 |
| 2 Bedroom | $125.00 |
| 3 Bedroom | $175.00 |
| Cleaning blinds | $50.00 |
| Replace window pane | $40.00 |
| Lock-outs after 5pm | $50.00 |
| Replace apartment light bulbs | $5.00 |
| Steam clean carpets | $200.00 |
| Wall plates (each) | $5.00 |
| Carpets damaged per square yard | $50.00 |
| Carpets replaced per square yard | $15.00 |
| Trash removal (minimum) | $25.00 |
| Cleaning windows (each) | $20.00 |
| Entry door to the unit | $175.00 |
| Interior doors | $75.00 |
| Wallpaper removal per wall | $70.00 |
| Furniture removal | $150.00 and up |

**Drywall replacement charged according to current market prices.**

| Chandeliers | $100.00 |
| Major sewer back-up caused by objects such as rags, diapers, feminine napkins, etc. put in toilets or drains (minimum) | $150.00 |

**Removal of Nicotine Damage charged according to current market prices.**

| $500.00 and | up |

Initials: 

Algon Flats

APARTMENT **#A201**

# APARTMENT DAMAGE CHARGES

Any other item not specifically mentioned in this lease, which is broken or damaged by a tenant's negligence, will be charged at replacement cost, plus additional labor.

We feel that if a resident is aware of this charge schedule at the time they move in, there will be less misunderstanding regarding charges both during occupancy and at move-out.

If you plan to use a private moving company, please have them provide the Management Office with proof of liability insurance. The property must be added as additionally insured by listing the name of the property and The Galman Group as additional insured with respect to general liability for insureds use of premises.

Work completed in house will be billed at the costs of material, a labor charge of $25.00 per man hour plus a 20% administration fee.

ALL OF THE ABOVE PRICES ARE SUBJECT TO CHANGE WITHOUT NOTICE. SUPPLY AND MATERIAL COSTS TO BE VERIFIED AT THE TIME OF REPLACEMENT. IF THE MANAGER IS REQUESTED TO PERFORM A SECOND MOVE-OUT INSPECTION, THERE WILL BE A $25.00 FEE.

MANAGEMENT RESERVES THE RIGHT TO CHARGE TENANT TO REPLACE *ALL OF THE CARPETING EVEN THOUGH THERE IS DAMAGE TO ONLY ONE* AREA BECAUSE CARPET CANNOT BE MATCHED.

| **Signed by Carlene Wyche** | **Signed by Brian Paule** |
|---|---|
| Mon Nov 29 2021 10:31:45 PM EST | Tue Nov 30 2021 12:29:26 PM EST |
| Key: 8D521C54; IP Address: 71.246.18.231 | Key: 517DCE7D; IP Address: 75.151.158.201 |

Carlene Wyche *(TENANT)*                                    *Date*      Brian Paule *(LANDLORD OR LANDLORD'S AGENT)*                        *Date*

Initials: 

Algon Flats

# ABANDONED PERSONAL PROPERTY

**Tenant:**                    <u>**Carlene Wyche**</u>
**Apartment Number:**    <u>**A201**</u>

In accordance with Section 505.1(b) of the Pennsylvania Landlord and Tenant Act, upon your relinquishment of possession and the acceptance of possession of the real property by us, you shall have ten days to contact us regarding your intent to remove any personal property remaining on the premises. If the intent is conveyed to us, the personal property shall be retained by us at a site of our choosing for thirty days. If no communication is made to us within ten days, the property may be disposed of at the end of the ten days, at our discretion.

**Notice: You will be required to pay any and all costs related to the removal or storage of property retrieved by you after ten days. If notice is given to us, and the property is not removed by you within thirty (30) days, it may be disposed of at our discretion.**



```
Signed by Carlene Wyche
Mon Nov 29 2021 10:31:52 PM EST
Key: 8D521C54; IP Address: 71.246.18.231
```



```
Signed by Brian Paule
Tue Nov 30 2021 12:29:26 PM EST
Key: 517DCE7D; IP Address: 75.151.158.201
```

Carlene Wyche *(TENANT)*                                      *Date*

Brian Paule *(LANDLORD OR LANDLORD'S AGENT)*          *Date*



Algon Flats

# ANIMAL ADDENDUM

This Addendum ("Addendum") is made part of the Residential Lease Contract ("Agreement") dated **November 29, 2021**, and is between the Owner of **Algon Flats** ("Owner") and **Carlene Wyche**, (collectively and individually "Residents"), for the premises at **7810 Algon Avenue, #A201 #A201, Philadelphia, PA  19111** (the "Leased Premises"), which is located within **Algon Flats** (the "Residential Community"). All capitalized terms used but not defined herein shall have the meaning set forth in the Agreement. Where the terms and conditions of this Addendum vary or conflict with the terms and conditions of the Agreement, the terms and conditions of this Addendum shall control.

1. No animals are permitted without the prior written consent of Owner. Any such consent may be revoked at any time, with or without cause, by giving **three (3) days** days written notice to Residents. Except to the extent written permission is given, animals may not be brought upon the Leased Premises, whether such animals belong to Residents or to any other person. The presence of any animals as to which written permission has not been given and is not currently in force, even if such animals are "just visiting," shall be deemed a material and incurable breach of this Addendum and shall be cause for the service of a notice terminating the tenancy. Service animals or companion animals are not subject to these provisions; however, Owner may require a written statement from a qualified professional verifying the need for the service or companion animal.

2. Subject to strict compliance with this Addendum, you are permitted to have the following **0** animal(s) on the Leased Premises:

> **No pets have been authorized at this time.**

3. **RENT.**   A total monthly animal rent of **$0.00** is required. The animal rent shall be due and payable with Residents' monthly rental payment.

4. **DEPOSIT.**   An additional deposit of **$0.00** is required. Upon vacating the Leased Premises, Owner shall do an inspection of the Leased Premises and any sanitizing or damage attributable to the animal(s) shall be charged to Residents accordingly. The animal deposit will be considered part of the general security deposit and can be applied to all damages. This additional security deposit shall be deemed part of the general security deposit for all purposes. The security deposit amount set forth in this Addendum is in addition to, and not in lieu of, any other security deposit paid by Residents. Refund of the security deposit will be subject to the terms and conditions set forth in the Residential Lease Contract.

5. **COMMUNITY RESTRICTIONS.**

    A. Animals must be under Residents' control when outside of Leased Premises and shall not be tied to anything or left unattended outside of Leased Premises. Residents shall be limited to a maximum of **2** animal(s) weighing not more than **35 pounds** per animal when fully grown, unless otherwise given written permission by Owner.

    B. When animal is acquired, additional sums may be required to be paid by Residents. Service or companion animals are not subject to this provision nor the standard animal deposits and animal rent requirements; however, Owner may require a written statement from a qualified professional verifying the need for the service animal or companion animal.

    C. Residents are responsible for the immediate removal of animal's waste. Animal owners are required to purchase and carry scoopers and/or trash bags when walking dogs within community, including designated dog run areas. Some communities may be equipped with pet waste disposal stations.

    D. Residents may not leave the animal on the patio, balcony or in the yard for extended periods of time.

    E. Animals are not allowed on landscaped or grassy areas under any circumstances.

    F. Patios should be kept clean of animal droppings. During hot weather, especially, odors from such can be extremely offensive to neighbors. No food is to be left outside.

    G. Because of health regulations, non-service animals are not permitted in or around the pool area, laundry rooms, or other recreational facilities. Any mess on the grounds created by the animal shall immediately be cleaned up by the pet owner.

    H. Owner is not obligated to make necessary or requested repairs while an animal is present in the Leased Premises.

    I. A charge of **$150.00** will be assessed for flea spraying in a Leased Premises which has contained an animal.

6. **INOCULATION.**   Said animal has been properly licensed and has current inoculations for the type of animal.

7. **DISTURBANCE.**   Residents will be asked to remove any animal that regularly disturbs residents, whether inside or outside, or constitutes a problem or obstruction to the agents and employees of Owner from properly performing their functions, duties and responsibilities.

8. **IMPOUNDMENT.**   If the animal is loose on the Leased Premises and Residents are not available or willing to retrieve it, Owner may, but is not obligated to, retrieve and return it to the Leased Premises, or cause appropriate officials to impound it. Residents agree to indemnify Owner for any damages and/or expenses incurred in carrying out any one of the foregoing


*Initial:* 



options.

9. **REVOCATION.**     If Residents fail to remove said animal following complaints from residents and requests from Owner, the Residents agree, on **three (3) days** days written notice, to remove animal from the Leased Premises permanently or lease will be terminated. Owner may revoke the consent given herein upon **three (3) days** days written notice, which revocation will require Residents to remove the animal from the Leased Premises within said **three (3) days** days.

10. **OWNER'S LIABILITY.**     In the event of injury or death of a pet, Owner will not be liable to Residents, any member of Residents' household, occupants, guests, invitees, or other persons for any indirect, incidental, consequential or special damages, whether foreseeable or not nor however caused, even if Owner is advised of the possibility of such damages.

11. **VIOLATION OF RULES/VIOLATION FEE.**     If Residents, any member of Residents' household, occupants, guests, invitees, or other persons violate any rule or provision of this Animal Addendum, then Owner may demand that Residents remove the animal permanently from the Leased Premises. Owner also has all other rights and remedies set forth in the Residential Lease Contract, including but not limited to damages, termination, and eviction. If Residents fail to clean up animal waste from any part of the Residential Community and Owner, as a result of Residents' noncompliance, is required to make arrangements to have the waste cleaned up, Residents shall pay Owner a sum of **$50.00**, per occurrence, as a liquidated damage. Said sum shall not limit Owner's right to terminate the tenancy, force Residents to remove the animal, and/or evict Residents, based upon any violation of this Addendum.

**In the event of a conflict between any provision in this Special Provision section and this Addendum or the Agreement, the provision in this Special Provision section shall control.**

• **No dogs allowed.**

INTENDING TO BE BOUND, the parties hereto have executed this Addendum as of the day and year first above written.

| Signed by Carlene Wyche | Signed by Brian Paule |
|---|---|
| Mon Nov 29 2021 10:32:08 PM EST | Tue Nov 30 2021 12:29:26 PM EST |
| Key: 8D521C54; IP Address: 71.246.18.231 | Key: 517DCE7D; IP Address: 75.151.158.201 |

Carlene Wyche *(TENANT)*                                    *Date*        Brian Paule *(LANDLORD OR LANDLORD'S AGENT)*                         *Date*



Algon Flats

# PHILADELPHIA BED BUG ADDENDUM

**Resident:**            <u>Carlene Wyche</u>

**Property Address:**    <u>7810-7820 Algon Avenue, Philadelphia, PA  19111</u>

1.  The history of bed bugs in your unit during the previous 120 days is as follows: *(check one)*
    a.  ☒  There has been no history of bed bug infestation
    b.  ❑  There was a bed bug infestation as follows *(describe the history of the bed bug infestation and the remediation that was done for the dwelling unit)*:

    _____

    _____

    _____

2.  Resident acknowledges having received the informational notice regarding bed bugs prepared by the City of Philadelphia, a copy of which is attached hereto.

3.  Owner has developed, maintained and is following a bed bug control plan as required by City of Philadelphia ordinance Section 9-4500 et seq.



```
Signed by Carlene Wyche          Signed by Brian Paule
Mon Nov 29 2021 10:32:19 PM EST  Tue Nov 30 2021 12:29:26 PM EST
Key: 8D521C54; IP Address: 71.246.18.231  Key: 517DCE7D; IP Address: 75.151.158.201
```

Carlene Wyche *(TENANT)*                     Date        Brian Paule *(LANDLORD OR LANDLORD'S AGENT)*        Date

18



# RULES AND REGULATIONS

**Algon Flats RULES AND REGULATIONS CONCERNING USE, OCCUPATION AND MAINTENANCE OF THE RENTAL UNIT, APPURTENANCES THERETO, AND THE BUILDING OF WHICH THE RENTAL UNIT IS A PART.**

Tenants under this Rental Agreement shall be responsible for the conduct of all family members, guests, and/or invitees while in the rental community and shall be liable for any damages caused by the same. The conduct of family members, guests and/or invitees while in the community may serve as the basis for termination of this Renal Agreement if the conduct violates this Rental Agreement, the Rules and Regulations or the Residential Landlord Tenant Code.

## USE OF THE PREMISES

Tenant agrees that, Tenant, members of the Tenant's family, guests, agents, servants or licensees shall:

1) Use the laundry and drying machines or only on such days, and at such hours as landlord may from time to time designate. Such equipment shall be used only for washing and drying clothes. Meter operated washing machines and clothes dryers have been installed in the basement of certain designated buildings for the convenience of residents. Tenants are required to remain in the laundry room until clothes are completely washed and dried. No individual dates are assigned for use. Laundry machines cannot be used during quiet hours (between the hours of 10 pm and 8 am). **The landlord assumes no responsibility for loss or damage that might arise from the use of the laundry rooms or for any physical injury sustained by the use thereof.**

2) Not keep or store any washing machines or dryers in the rental unit, unless already supplied by the Landlord.

3) Not engage in loud singing, talking or other disturbing behavior while in the laundry room.

4) The drying or airing of clothes or other articles outside the rental building, front of windows, on the ground, racks or other drying devices is prohibited.

5) Comply with moving hours and conditions as established by Landlord. All packing cases, barrels, boxes and other containers used in moving must be removed by Tenant. Moving or delivery trucks or vans are not permitted to cross the curb, walks or lawns, and must load and unload from the streets, cart ways or parking areas.

6) Abide by the directions of Landlord for the proper operation of heat, ventilation and air conditioning and not open windows while heat and air conditioning is in operation.

7) Dispose of garbage, refuse and waste matter in such manner and at such places as Landlord may direct. Individual trash and garbage containers are not permitted to be placed in public halls or outside rental buildings. No Tenant shall discard trash, rubbish, cans, bottles or waste except in authorized containers.

8) Landlord shall provide appropriate curtains or shades for windows and doors within a period of 30 days from the commencement of said rental agreement. Tenant shall maintain said blinds and shades.

9) Play area for children. Games, sports and recreational activities of all kinds are only permitted in designated play areas which have been provided by the Landlord. Such activities are not permitted on the common lawn areas. Children are not permitted to play in the basement, halls, stairways or other common areas inside of the building.

10) Not install any awnings, venetian blinds, shades or other window coverings, which are visible from the exterior of the unit, which has not been previously approved in writing by the Landlord as being consistent with the Standards for Window treatments.

11) Not exhibit or cause to be exhibited the name of the Tenant, or the email address of the Tenant, in any place except that provided by the Landlord for such purposes. Landlord has provided a bulletin board in each building.

12) Not place any sign, notice, legend or advertising or email address on any part of the building of which the rental unit is a part or upon any door or window thereof.

13) Not connect any television or aerial of any nature to the building, nor any electrical appliance, equipment or apparatus, which Landlord may require, or may cause, the removal of same, at Tenant's expense.

14) Not make any alterations, improvements or additions to the rental unit or to the building of which rental unit it is a part without written consent of the Landlord, and make any and all alterations, improvements or additions with Landlord's written consent shall be removed by Tenant and the rental unit restored to the same good order in which it is now, all at the expenses of the Tenant as additional rent.

15) Not obstruct the corridors, walls, passages, stairways, entrances or any other places in the building of which the rental unit is a part in any way or manner whatsoever or obstruct the sidewalks in front of or leading to the building of which the rental unit is a part.



**16)** Not use the ground floor of the building in which the rental unit is situated for storage except in such part thereof as shall be specifically designated by the Landlord for use by the Tenant for storage purposes.

**17)** Not erect any outside aerials, wires or equipment in connection with any radio or television or make any other outside installation without prior written consent of the Landlord.

**Maximum limit of number of persons of occupancy. No more than two persons may occupy any one bedroom apartment and no more than four individuals may occupy a two bedroom apartment. Any violation of this rule shall constitute grounds for termination of the rental agreement. Only occupants listed on the application or approved in writing by the Landlord may occupy the rental unit.**

**18)** Storage lockers are not available.

**19)** All supplemental heaters are prohibited. Tenant may not use or store any kerosene, oil, wood or coal heaters in the rented unit. The units are prohibited by State Law from being used by residents in multi-family housing.

**20)** Not add, remove, alter or change the locks on the rental unit, at tenant's cost without the prior written consent of the Landlord unless;

    **a)** The tenant notifies the Landlord in writing and supplies the Landlord with a key to the lock;

    **a)** The new lock fits into the system already in place; and

    **b)** The lock installation does not cause damage to the door.

    **c)** Absolutely no additional or supplemental locks may be installed upon the rental unit door. Chain locks may be put upon the door for further protection while the tenant is in the unit.

**21)** Not erect or maintain or allow or permit to be erected or maintained any window boxes on the exterior or interior sills of any windows in the renal unit of the building of which the rental unit is a part.

**22)** Not use cooking equipment in such manner as to permit noxious odors to permeate the building or otherwise interfere with the rights of other Tenants; no outside grills or cooking of any kind is permitted around the building or otherwise interfere with the rights of other Tenants; no outside grills or cooking of any kind is permitted around the building or on any balcony.

**23)** Outside grills or outside cooking of any kind is not permitted.

**24)** Balconies and Patios: Are property of the Landlord and considered common areas. Balconies and patios should always be neat and tidy. Clothes should not be hung on railings or any part of balcony or patio. Balconies and patios should be additional living area and not a storage area.

**25)** Maintain the premises in a good state of preservation and cleanliness.

**26)** During the winter months or when subfreezing weather is forecast, water pipes may freeze and break if proper precautions are not taken. No tenant shall ever turn the thermostat below 60 degrees. If the pipes in your dwelling or in the units above or next to you freeze and break, there can be substantial water damage to your property, other resident's property and/or the owners' property. In the event that damage is sustained due to your failure to take the proper precautions, you will be responsible for any and all damages which may have been sustained.

**27)** Any window decor must be white on the street side.

**28)** Tenants are responsible to repaint the apartment if occupied less than one year. If tenant vacates the apartment prior to two full years of occupancy, tenant will be charged ½ re-paint fee.

**29)** Tenant is responsible to professionally steam clean carpets upon vacating unit.

**30)** Tenants occupying apartments with wood floors MUST have at least 75% of the floor covered with area rugs in order to prevent disturbances to other residents.

### NOISE AND DISTURBANCES

Tenant agrees that Tenant, members of Tenants family, guests, agents, servants or licensees shall:

**31)** Not make or permit to be made by any family member, guest or invitee any disturbing noises in or about the rental unit, nor engage in conduct or behavior which:

    **a)** Interferes with other tenants quiet enjoyment of the premises, or:

    **b)** Is likely to confer substantial risk of physical harm to other occupants, or;

    **c)** Is illegal conduct, or;

    **d)** Is loud, boisterous behavior, or;



**e)** Is conduct which interferes with the rights, comforts or conveniences of other tenants or neighbors, or;

**f)** Involves the playing of or permitting to be played any musical instruments, television, radio or other noise creating equipment if the same shall disturb or annoy other tenants or neighbors, or;

**g)** Causes a public nuisance or breach of any Code, Statue or Ordinance governing such conduct.

**32)** The tenant shall not make or permit any disturbing noises in or around the said premises by himself, his family, friends, or servants or do or permit anything conduct by such persons that will interfere with the rights, comforts or convenience of other tenants. The tenant shall not allow the playing of or operation of musical instruments, radio, TV or stereo between the hours of 11:00 pm and 7:00 am. Loud playing of such instruments, radios, TV's or stereos is discouraged at any hour.

### CONDUCT

Tenant agrees that, tenant, members of tenant's family, guests, agents, servants or licensees shall:

**33)** Not bring anything to or keep anything in the rental unit or the building of which rental unit is a part, or commit or allow to be committed any act objectionable to the fire or other hazard insurance companies for the landlord whereby the fire or other hazard insurance on the rental unit or any part thereof or on the building of which the rental unit is a part shall become void, suspend or rated as more hazardous substance of other obnoxious substances.

**34)** Not bring into or keep upon or suffer to be brought into or kept in the rental unit or the building of which the rental is a part any explosives or hazardous substance or other obnoxious substances.

**35)** Not deliver or cause to be delivered in the building without prior notice to the Landlord any furniture, furnishings or freight before the first date for which rent has been paid in the initial entry for occupancy by the Tenant, permissions for deliveries to the rental unit, in the absence of the Tenant, must first be obtained from Landlord.

**36)** Not shake from any window, door or balcony or hand outside any window or balcony any carpet, rug, bed clothing or other articles, or sweep any dirt, refuse or other matter from the rental unit into the entrance way; or throw or permit anything to be thrown out of any windows or doors, or upon the exterior areas of the building, since any such conduct would be a threat to the health, safety and welfare of the tenants, guests, invitees or employees of the Landlord.

**37)** Not place or deposit or allow any cleaning or other equipment to be placed or deposited outside of the rental unit or outside the building of which the rental unit is part.

**38)** Not permit the delivery of kitchen supplies, market goods, laundry ice or other supplies, property or packages of any kind, other than directly into the premises or at the entrance provided therefore, no lease any articles of any nature there for collection by others, and Landlord will not be held responsible for any loss of damage to any such property, not will Lessor be responsible for any articles left with any employee or in any part of the building in this apartment complex.

**39)** Not use the toilets or other plumbing appliances for any purpose other than that for which they are constructed and intended, not place any sweepings, rubbish, rags or fish gravel or other improper articles therein. Any damages resulting from any misuse thereof shall be borne by the Tenant.

**40)** Not mark the wall, ceilings, floors or woodwork by driving nails, tacks, screws or otherwise defacing same. Tenant will be responsible for disfiguration of cabinets, refrigerator or walls by the application of any paper, paint or decals.

**41)** Not lean upon or deface screens, windows, storm doors or doors, not cause or permit the removal of screens, windows, storm doors, or doors and Tenant shall be responsible for any damage or injury resulting from any such removal.

**42)** Not bring in the rented unit, or allow to be brought into the rented unit, without prior consent from the Landlord, any of the following:

**a)** Water beds; Water beds may be permitted provided that the tenant informs the Landlord in writing of their desire to use a water bed and the tenant provides the landlord proof of insurance and a certification that such bed does not pose a threat to the structural integrity of the building. Failure to notify the landlord of the use of the waterbed shall be considered a material breach of the rental agreement.

**b)** Weight Lifting Equipment

**c)** Hot Tubs

**d)** Fish Tanks over 10 gallons

**e)** Large appliances not provided by the landlord

**43)** Not solicit for any purpose or cause within the rental facility.

**44)** Engage in conduct which causes or threatens to cause irreparable harm to any person or property, or be convicted of a class A misdemeanor or felony during the term of the tenancy which caused or threatened to cause irreparable harm to



Algon Flats

any person or property. In either event the landlord may, without notice, remedy the breach caused by the conduct and bill the tenant as provided in the Residential Landlord Tenant Code or immediately terminate the rental agreement upon notice to the tenant and bring tan action for summary possession; or do both.

**45)** Be responsible for unnecessary discharge or replacement of fire extinguisher and for proper use of smoke detectors. All damages or missing parts will be assessed to tenant. Resident is responsible for sprinkler engagement or any damage it causes.

## ENTRANCES, FRONT WALKS AND LAWNS

Tenant agrees that, Tenant, members of Tenant's family, guests, agents, servants or licensees shall:

**46)** Not obstruct any walkways, passageways, stairways and similar facilities from egress or ingress by tenants, guests and invitees and said areas shall at all times be kept free and clear and be used only for the purpose for which they are intended.

**47)** Not permit the placement or storage of sleds, baby carriages, bicycles, wagons, toy vehicles, baby playpens on lawn passageways, entrances, front walks, and lawns or other common areas of the building. All deliveries must be made to the entrance of doors of the rental unit and no empty containers are permitted in public hallways overnight.

**48)** Not permit children to play in public halls, stairways or entrances, not use or permit to be used the area around the building for outside games, sports and recreational activities except those in areas specifically designated by the Landlord.

## AUTOMOBILES, TRUCKS AND OTHER VEHICLES

Parking spaces have been provided for the use of tenants, and parking will be strictly limited to the areas set aside for such purpose. Tenant agrees that, Tenant, members of Tenant's family, guests, agents, servants or licensees shall:

**49)** Not permit or cause any vehicle parking in any parking area provided nearest the building of which the Tenant's rental unit is a part. Only two vehicles per unit are permitted.

**50)** Not park any unsightly vehicle on the property. An unsightly vehicle includes but is not limited to a vehicle containing body rust or body metal which is not painted in accordance with manufacturers specifications, missing body parts such as bumpers, fenders, etc. The determination of whether a vehicle is unsightly shall be at the sole discretion of the Landlord.

**51)** Not cause or permit any person to wash, clean, polish or major repairs to any motor vehicle in the parking area or in any other portion of the apartment complex.

**52)** Not park or store or suffer or permit to be parked or stored in any parking area any trailer, truck, nursery trailer or disable motor vehicle with either expired tags or commercial or unlicensed vehicles.

**53)** All residents who own an automobile or other motor vehicle must register such vehicles by obtaining a parking permit which must be displayed, and any vehicles parked in a marked handicap space must display a handicap tag or placard.

**54)** Not park any vehicle in front of the dumpster entrance, in front of any area marked FIRE LANE, or in front of any building entrance walkway.

Any violations may result in vehicles being towed at the owner's expense.

## ANIMALS

Tenant agrees that, Tenant, members of tenant's family, guests, agents, servants or licensees shall:

**55)** Not permit any pet or animal of any kind in or about the rental unit or the building of which the rental unit is a part, except with the prior written consent of the Landlord, and a pet security deposit is paid (only 2 permitted). If necessary, a flea treatment charge will be made upon vacating the apartment.

**56)** Landlord will assume no responsibility for extermination of the rental unit for fleas. At the Landlords option, the cost of flea extermination may be charged to the tenant.

**57)** Upon move-out inspection, if the carpets are found to be damaged by animal urine or spray, or animal clawing, be it either dog or cat, a fee will be charged to the tenant.

**58)** All pets, except tropical fish or fresh water fish, must be registered with the Management Office at the address and telephone number stated in the Lease.

**59)** No fish tanks/aquariums over 10 gallons allowed.

**60)** Pets must be kept on a regular leash at all times when outside of his/her apartment. Extendable leashes are not permitted on the property.

**61)** Unattended pets are not allowed to be leashed/tied outside at any time. Pets are not allowed to freely roam the community



Algon Flats

and must be walked through the parking lot with caution.

**62)** Only one (1) dog (if applicable) or two (2) cats or one (1) cat and one (1) dog (if applicable) shall be permitted to an apartment, unless consent in writing is obtained from the Landlord. Such pet shall be over one year. Landlord reserves the right to charge the Resident an additional Pet Fee if their request is granted.

**63)** As owner of the animal, you're strictly liable for the entire amount of any injury that the animal causes to a person or any anyone's property. You'll indemnity us for al costs of litigation and attorney's fees resulting from any such damage.

Tenant, in signing in space provided below, hereby acknowledges that Tenant has read and understands the Rules and Regulations as set forth above and agrees that any violations of these Rules and Regulations shall entitle Landlord to terminate this Rental Agreement.



**Signed by Carlene Wyche**
Mon Nov 29 2021 10:32:49 PM EST
Key: 8D521C54; IP Address: 71.246.18.231

**Signed by Brian Paule**
Tue Nov 30 2021 12:29:26 PM EST
Key: 517DCE7D; IP Address: 75.151.158.201

Carlene Wyche *(TENANT)*                    *Date*

Brian Paule *(LANDLORD OR LANDLORD'S AGENT)*                    *Date*



Algon Flats

# KEYS, PERMITS, AND ACCESS DEVICES ADDENDUM

This is an addendum to the Residential Lease Contract dated **November 29, 2021** between **Algon Flats** ("Owner") and **Carlene Wyche** ("Residents") for the residence located at **7810 Algon Avenue, #A201 #A201, Philadelphia, PA  19111** (the "Leased Premises").

Residents acknowledge that they have been provided with keys and access devices listed below:

| | |
|---|---|
| **2** | Building |
| **1** | Mailbox Key(s) - Mailbox #: **A-201** |
| **2** | Apartment Keys |
| **1** | Parking Permit(s) |
| **2** | Deadbolt key(s) |

Residents will be liable for the below listed charges for replacing keys, permits, tags, and access devices.

| Deposit Amounts | |
|---|---|
| Building Key | 1 X $0.00 = **$0.00** |
| Mailbox Key | 1 X $0.00 = **$0.00** |
| Apartment Keys | 2 X $0.00 = **$0.00** |
| Parking Permit | 1 X $0.00 = **$0.00** |
| Deadbolt Key | 2 X $0.00 = **$0.00** |

| Replacement Costs | |
|---|---|
| Building Key | $50.00 |
| Mailbox Key | $35.00 |
| Apartment Keys | $35.00 |
| Deadbolt Key | $35.00 |

**Signed by Carlene Wyche**
Mon Nov 29 2021 10:33:11 PM EST
Key: 8D521C54; IP Address: 71.246.18.231

Carlene Wyche *(TENANT)*                                    *Date*

**Signed by Brian Paule**
Tue Nov 30 2021 12:29:26 PM EST
Key: 517DCE7D; IP Address: 75.151.158.201

Brian Paule *(LANDLORD OR LANDLORD'S AGENT)*                 *Date*

*Initial:* 



Algon Flats

**Creating Great Places**
**To Live, Work & Shop**

# DISCLOSURE OF INFORMATION ON LEAD-BASED PAINT AND/OR LEAD-BASED PAINT HAZARDS LEAD WARNING STATEMENT

Housing built before 1978 may contain lead-based paint. Lead from paint, paint chips and dust can pose health hazards if not managed properly. Lead exposure is especially harmful to young children and pregnant women. Before renting pre-1978 housing, lessors must disclose the presence of known lead-based paint and/or lead-based paint hazards in the dwelling. Lessees must also receive a federally approved pamphlet on lead poisoning prevention.

### Lessor's Disclosure

**(a)** Presence of lead-based paint and/or lead-based paint hazards (check (i) or (ii) below):

    **(i)** ❏ Known lead-based paint and/or lead-based paint hazards are present in the housing (explain).

    _____

    _____

    **(ii)** ☒ Lessor has no knowledge of lead-based paint and/or lead-based paint hazards in the housing.

**(b)** Records and reports available to the lessor (check (i) or (ii) below):

    **(i)** ☒ Lessor has provided the lessee with all available records and reports pertaining to lead-based paint and/or lead-based paint hazards in the housing (list documents below). **Cert of Lead-Based paint compliance**

    **(ii)** ❏ Lessor has no reports or records pertaining to lead-based paint and/or lead-based paint hazards.

### Lessee's Acknowledgement (initial)

**(c)** Lessee has received copies of all information listed above.

    Initial: 

**(d)** Lessee has received the pamphlet *Protect Your Family from Lead in Your Home*.

    Initial: _____

### Agent's Acknowledgment

❏ Agent has informed the lessor of the Landlord's obligations under 42 U.S.C. 4852(d) and is aware of his/her responsibility to ensure compliance.

### Certification of Accuracy

The following parties have reviewed the information above and certify, to the best of their knowledge, that the information they have provided is true and accurate.



Carlene Wyche *(TENANT)*                                     Date



Brian Paule *(LANDLORD OR LANDLORD'S AGENT)*        Date



Algon Flats

# MOLD ADDENDUM

This Addendum ("Addendum") is made part of the Residential Lease Contract ("Agreement") dated **November 29, 2021**, and is between the Owner of **Algon Flats** ("Owner") and **Carlene Wyche**, (collectively and individually "Residents"), for the premises at **7810 Algon Avenue, #A201 #A201, Philadelphia, PA  19111** (the "Leased Premises"), which is located within **Algon Flats** (the "Residential Community"). All capitalized terms used but not defined herein shall have the meaning set forth in the Agreement. Where the terms and conditions of this Addendum vary or conflict with the terms and conditions of the Agreement, the terms and conditions of this Addendum shall control.

Owner has inspected the Leased Premises prior to Residents' occupancy, and Owner knows of no damp or wet building materials and knows of no mold or mildew contamination. Residents are hereby notified that mold, however, can grow if the Leased Premises are not properly maintained or ventilated. If moisture is allowed to accumulate in the Leased Premises, it can cause mold and mildew growth. There are no established guidelines for unacceptable air quality caused by mold. Mold is a naturally occurring phenomenon. Mold and/or mildew should be cleaned as soon as it appears. Mold and/or mildew growth can often be seen in the form of discoloration. The different colors of mold range from white to black, including, but not limited to, green, gray, brown, orange, yellow and other colors.

Residents agree to maintain the Leased Premises in a manner that prevents the occurrence of mold or mildew growth within the Leased Premises. In furtherance of such obligation, Residents agree to perform the following:

1.  Keep the Leased Premises free from moisture, dirt and debris that can harbor mold.

2.  Inspect the Leased Premises regularly for the indications and sources of indoor moisture.

3.  Immediately notify Owner, in writing of any discoloration evidenced on walls, floors, or ceiling and/or any water intrusion, such as roof leaks, window leaks, plumbing leaks, drips, flooding, or "sweating" walls or pipes.

4.  Immediately notify Owner, in writing, of overflows from bathroom, kitchen or any other water source facilities, especially in cases where the overflow may have permeated walls, flooring or cabinets.

5.  Immediately notify Owner, in writing, of the presence of any mold growth on surfaces inside the Leased Premises.

6.  Allow Owner to enter the Leased Premises to inspect and make necessary repairs, in the event mold or water intrusion is present.

7.  Utilize bathroom fans while showering or bathing, and notify Owner of any nonworking fans.

8.  Utilize stove hood vents/exhaust fans whenever cooking, dishwashing, or cleaning.

9.  Use all reasonable care to close all windows and other openings in the Leased Premises to prevent outdoor water from penetrating into the interior of the Leased Premises.

10. Clean and dry any visible condensation/moisture on windows and window tracks, walls, and any other surfaces, including personal property, as soon as reasonably possible.

11. Notify Owner of any problems with air conditioning or heating systems that are discovered by Residents.

**NOTE:** Mold can grow on damp surfaces within 24 to 48 hours. Condensation on windows indicates that fresh air is not being circulated in the Leased Premises. To prevent condensation/moisture buildup, open windows and air out the Leased Premises for short periods of time to keep fresh air present. Maximize the circulation of air by keeping furniture away from walls and out of corners. Residents may add a little dish soap to the water mixture to cut any dirt and oil on the surface that Residents are cleaning that may contain mold. Do not add other cleaning chemicals, especially ammonia. Dispose of any rags or sponges used to clean the mold in a sealed bag.

Residents agree to indemnify and hold harmless Owner and Owner's Agent from any suits, actions, claims, losses, damages, and expenses and any liability whatsoever that Owner and/or Owner's Agent may sustain or incur as a result of Residents' failure to comply or perform with the obligations set forth above or as the result of intentional or negligent action or failure to act on the part of Residents or any other person living in, occupying, or using the Leased Premises, except if the liability is based upon a negligent act or omission of Owner and/or Owner's Agent.

INTENDING TO BE BOUND, the parties hereto have executed this Addendum as of the day and year first above written.



**Signed by Carlene Wyche**
Mon Nov 29 2021 10:33:35 PM EST
Key: 8D521C54; IP Address: 71.246.18.231

**Signed by Brian Paule**
Tue Nov 30 2021 12:29:27 PM EST
Key: 517DCE7D; IP Address: 75.151.158.201

Carlene Wyche *(TENANT)*                                    Date        Brian Paule *(LANDLORD OR LANDLORD'S AGENT)*                    Date



Algon Flats

# PARCEL ACCEPTANCE RELEASE ADDENDUM

I/WE authorize **Algon Flats** to accept parcels (e.g. U.P.S., Federal Express, Airborne Express or any other overnight delivery service, Regular, Certified or Registered Mail) for me in my absence from the premises.

In the event of loss, damage or theft of any parcels, I/we release **Algon Flats**, **The Galman Group** and its employees from any liability whatsoever.



```
Signed by Carlene Wyche
Mon Nov 29 2021 10:33:41 PM EST
Key: 8D521C54; IP Address: 71.246.18.231
```

```
Signed by Brian Paule
Tue Nov 30 2021 12:29:27 PM EST
Key: 517DCE7D; IP Address: 75.151.158.201
```

Carlene Wyche *(TENANT)*                    *Date*        Brian Paule *(LANDLORD OR LANDLORD'S AGENT)*                    *Date*



Algon Flats

# PARKING/STORAGE/GARAGE ADDENDUM

This Addendum ("Addendum") is made part of the Residential Lease Contract ("Agreement") dated **November 29, 2021**, and is between the Owner of **Algon Flats** ("Owner") and **Carlene Wyche**, (collectively and individually "Residents"), for the premises at **7810 Algon Avenue, #A201 #A201, Philadelphia, PA  19111** (the "Leased Premises"), which is located within **Algon Flats** (the "Residential Community"). All capitalized terms used but not defined herein shall have the meaning set forth in the Agreement. Where the terms and conditions of this Addendum vary or conflict with the terms and conditions of the Agreement, the terms and conditions of this Addendum shall control.

| Vehicle Information | | | | | | |
|---|---|---|---|---|---|---|
| **Year:** | **Make:** | **Model:** | | **Color:** | **Plate #:** | **State:** |
| 2017 | Mercedes | E300 | | Black | LRN4025 | PA |
| **Parking/Storage Information** | | | | | | |
| **Parking Space #(s):** | **Garage #(s):** | | **Carport #(s):** | **Parking Permit #(s):** | | **Storage #(s):** |
| N/A | N/A | | N/A | 9062 | | N/A |
| **Parking Rent:** | | **Garage Rent:** | | **Carport Rent:** | | **Storage Rent:** |
| $0.00 | | $0.00 | | $0.00 | | $0.00 |

1. Residents agree to rent the herein described premises at the rate of **$0.00** per month. Failure to pay in full will be considered partial payment of the total rent due. Rent is due and payable on or before the **1st** of the month, with payment of rent for the Leased Premises.

2. Residents agree to pay an additional Security Deposit in the amount of **$0.00**, prior to taking occupancy of the above-listed item. This security deposit will be considered part of the general security deposit and can be applied to all damages. This additional deposit effectively increases an existing or pre-existing Security Deposit, and, at Owner's sole option, may be retained by Owner to offset any Residents' default in and/or non-compliance with the Residential Lease Contract, the Parking/Storage/Garage Addendum or any applicable law termination.

3. Failure to pay rent before the **3rd** of the month will result in a 30-Day Notice to terminate this agreement.

4. Any items shall be deemed abandoned if not removed within ten (10) days after termination of the Residential Lease Contract. Upon such abandonment, Owner may remove all personal property therein and sell it at public sale and the proceeds from the sale thereof may be applied to the expenses for removal, advertisement of sale, and for lost rental revenues.

5. This addendum will be concurrent with the term of the Residential Lease Contract and terminates upon the termination of occupancy of the Leased Premises.

6. To the extent allowed by applicable law, Owner shall not be liable for any damage or loss to personal property, motor vehicles of, or the contents of motor vehicles of, Residents, any member of Residents' household, occupants, guests, invitees, or other persons. Failure of Residents, any member of Residents' household, occupants, guests, invitees, or other persons to follow Community Rules and/or posted signs relating to parking and operation of vehicles will result in the towing of the offending vehicle at the cost of the vehicle owner. The location and number of any parking space(s) assigned to Residents may be changed at any time at the sole discretion of Owner.

## STANDARD STORAGE POLICIES

1. Residents agree to use the storage space for the storage of personal belongings. The storage space may not be used for occupancy, entertainment, conducting business, or storage of a motor or recreational vehicle. Loitering is prohibited in the storage space.

2. Residents agree to keep the door to the storage space closed and secure when not present.

3. Items that pose an environmental hazard or a risk to the safety or health of other residents, occupants, or neighbors in Owner's sole judgment or that violate any government regulation may not be stored in the storage space. Prohibited items include fuel (other than a properly capped fuel tank of a vehicle), fireworks, rags, piles of paper, or other material that may create a fire or environmental hazard. Owner may remove from such areas, without prior notice, items that Owner believes might constitute a fire or environmental hazard.

4. Storage of food or other recyclable goods which could attract vermin is prohibited.

5. Residents agree not to store or cage animals in the premises.

6. Owner assumes no responsibility for damage caused by insects or weather conditions to items stored in the premises.

7. Residents acknowledge that Owner does not provide insurance to cover Residents' belongings. Owner has no liability whatsoever for loss or damage to Residents' property whether by fire, theft, vandalism or while items are within the premises.

8. Residents agree to obtain renters insurance for all items stored in the premises.

9. No improvements or alterations shall be made without written consent of Owner. To protect the walls of the premises, use of screws, nails or hooks upon the floors, doors, cabinets or walls are prohibited without Owner's prior written permission.

10. Residents acknowledge that the storage space does not include a smoke/carbon monoxide detector unless required by

 

Algon Flats

law.

**11.** Owner reserves the right to inspect the storage space at any time for emergency or for the purpose of compliance with the terms and conditions of this addendum.

### STANDARD PARKING POLICIES

**1.** Residents agree vehicle(s) must be registered and insured as required by state and local law. Inoperable and/or illegally parked vehicles will be towed at vehicle owner's expense.

**2.** Vehicles must be operating on a **weekly basis**. Inoperable vehicles are considered but not limited to those vehicles not driven regularly, those with flat tires, not mechanically fit or properly registered.

**3.** Auto repairs are not permitted on the premises.

**4.** Music and noise from vehicles must be kept at a minimum to avoid disturbing other residents.

**5.** Residents are responsible for maintaining the parking stalls free of oil spills or other fluid leaks.

**6.** Parking spaces may not be used for storage of any kind.

**7.** Guest parking is limited to: **Street Parking and Off Premises**.

**8.** Vehicles stopped, parked or double parked in handicap spaces (without displaying appropriate permits), fire hydrant restricted areas, non-designated parking areas, red zones, other residents' assigned spaces or rental office parking may be subject to citations and/or towing at the vehicle owner's expense, as allowed by applicable law.

**9.** Assigned spaces can be changed at any time at the discretion of Owner.

**10.** Car washing on the premises is prohibited.

**11.** Speed limits are **5 miles per hour** miles per hour throughout the community.

**12.** Boats, trailers, recreational vehicles and over-sized trucks may not be parked or stored in parking facilities.

**13.** Parking Permits will be displayed at all times when parked on the premises.

**14.** All vehicles must be registered with the rental office. Owner must be notified of changes in vehicles and/or vehicle tags.

**15.** Residents acknowledge that Owner does not provide insurance to cover vehicles or their contents.

**In the event of a conflict between any provision in this Special Provision section and this Addendum or the Agreement, the provision in this Special Provision section shall control.**

- **One (1) parking spot per leaseholder.**

INTENDING TO BE BOUND, the parties hereto have executed this Addendum as of the day and year first above written.



Signed by Carlene Wyche
Mon Nov 29 2021 10:34:01 PM EST
Key: 8D521C54; IP Address: 71.246.18.231



Signed by Brian Paule
Tue Nov 30 2021 12:29:27 PM EST
Key: 517DCE7D; IP Address: 75.151.158.201

Carlene Wyche *(TENANT)*                              *Date*        Brian Paule *(LANDLORD OR LANDLORD'S AGENT)*        *Date*

 

# REASONABLE ACCOMMODATION POLICY

It is the policy of **Galman Group, Ltd.** and **Algon Flats**, hereinafter collectively referred to as **The Galman Group** to provide reasonable accommodations of its rules, policies, practices and services to applicants and tenants with disabilities in accordance with the requirements of federal, state and local laws, unless the requested accommodation will create an undue burden or is unreasonable, as defined under the applicable laws.

**The Galman Group** will neither engage in nor tolerate unlawful retaliation of any kind against any person who makes a request for a reasonable accommodation or who otherwise receives a reasonable accommodation as set forth in this policy. **The Galman Group** will not impose any additional fees or costs on any applicant or tenant who request a reasonable accommodation.

# PROCEDURES FOR REQUESTING A REASONABLE ACCOMMODATION

1. Tenant acknowledges that he or she will contact **Brian Paule**, Director of Property Management at **P.O. Box 646, Jenkintown, PA 19046** and/or **(215) 886-2000** to make a request for a reasonable accommodation of **The Galman Group**'s rules, policies, practices and services related to tenant's disability/disabilities.

2. While tenant may request a reasonable accommodation orally, **The Galman Group** recommends that you make the request in writing, on the Reasonable Accommodation Request Form. A blank form is attached to this Policy, and additional forms may be obtained in the local Management Office or by verbal request to **Brian Paule**, Director of Property Management at **(215) 886-2000**, or by written request to **Brian Paule**, Director of Property Management at **P.O. Box 646, Jenkintown, PA 19046**.

3. Tenant may submit the completed form in person at **261 Old York Road, Jenkintown, PA  19046** or mail it to **Brian Paule**, Director of Property Management at **P.O. Box 646, Jenkintown, PA 19046**. We prefer that Request Forms be submitted via Certified Mail. While this method is not required, it ensures that we each have a record of the request.

4. Tenant acknowledges that he or she should contact **Brian Paule**, Director of Property Management at **(215) 886-2000** to the extent you have any questions regarding the form or if you need any assistance in providing the information set forth in the form. **The Galman Group** will provide the tenant with any assistance that is reasonably necessary to complete and fill out the form.

5. **The Galman Group** will provide you with a written acknowledgement of your request for an accommodation within fourteen (14) days of **The Galman Group**'s receipt of a request.

6. **The Galman Group** will consider all requests for accommodations and will grant those requests that are reasonable, as defined under federal, state and local law. **The Galman Group** will provide you with a written decision regarding your request for an accommodation within thirty (30) days of **The Galman Group**'s receipt of a request, including an explanation if the request is denied. Prior to denying a request, **The Galman Group** will attempt to engage in an interactive process with you if additional information is needed, or to discuss possible alternative accommodations that might effectively meet your disability-related needs.

7. If an alternative accommodation will meet your disability-related needs and allow you an equal opportunity to use and enjoy the housing community, **The Galman Group** may offer you the alternative accommodation instead of the originally requested accommodation. **The Galman Group** recognizes that a person with a disability is generally in the best position to know whether or not a particular accommodation will be effective in meeting his or her needs.

8. If you believe that your request for a reasonable accommodation has been denied unlawfully or that the response is delayed unreasonably, you may file a complaint with:

   U.S. Department of Housing and Urban Development
   Philadelphia Office of Fair Housing and Equal Opportunity
   100 Penn Square East, 12th Floor
   Philadelphia, PA 19107
   (888) 799-2085
   www.hud.gov

9. **The Galman Group** will keep confidential any information or documentation disclosed in connection with any request for a reasonable accommodation, except as otherwise required by law. Copies of any request for reasonable accommodations, including any related documentation and **The Galman Group**'s written decisions on the requests will be maintained in the tenant file.



**10.** Tenant acknowledges that he/she has received a copy of **The Galman Group**'s Reasonable Accommodation Policy and understands the requirements to request a reasonable accommodation pursuant to this Policy.

I understand the above statements:

✓ **Signed by Carlene Wyche**
Mon Nov 29 2021 10:34:15 PM EST
Key: 8D521C54; IP Address: 71.246.18.231

Carlene Wyche *(TENANT)*                                    *Date*

31



# RESIDENT'S REASONABLE ACCOMMODATION REQUEST FORM

Galman Group, Ltd. and **Algon Flats** are committed to the letter and spirit of the federal Fair Housing Act, and other state and local fair housing laws, which, among other things, prohibit discrimination against persons with disabilities. In accordance with our statutory responsibilities and management policies, we will make reasonable accommodations in our rules, policies, practices, or services, when such accommodations may be necessary to afford persons with disabilities an equal opportunity to use and enjoy their housing communities. If you are requesting such an accommodation, please fill out this form and return it by mail, to Brian Paule, Director of Property Management, P.O. Box 646, Jenkintown, PA 19046, or in person to 261 Old York Road, Suite 110, Jenkintown, PA 19046. All information provided in connection with this request will be kept confidential, except as otherwise required by law.

Resident's Name: _____

Address: _____

Date of Request: _____

Please describe the accommodation (exception to our usual rule or policy) that you are requesting:

_____

_____

**1.** Do you consider yourself to be disabled?

*The Fair Housing Act defines a person with a disability as a person who has a physical or mental impairment that **substantially** limits one or more major life activities, a person who is regarded as having such an impairment, or a person with a record of such an impairment.*

YES        NO

**2.** Please describe your disability-related need for the requested accommodation. How is the accommodation necessary for your use and enjoyment of your apartment community? (If needed, you may write on the back of this form or attach additional sheets of paper.)

_____

_____

_____



Algon Flats

# RESIDENT CONTACT INFORMATION

| **ADDRESS:**<br>7810 Algon Avenue, #A201 Philadelphia, PA19111 | **LEASE PREMISES #:**<br>A201 |
|---|---|
| **RESIDENT:**<br>Carlene Wyche | |
| **PREFERRED METHOD OF CONTACT:**<br>❏ Telephone  ☒ Email  ❏ Text | |
| **E-MAIL ADDRESS:**<br>cw316@yahoo.com | |
| **DAY TIME CONTACT NUMBER:**<br>(267) 974-6619 | **EVENING TIME CONTACT NUMBER:** |

It is imperative that whenever you make a change to your contact information that you let us know so that we can update our records. Thank you for your cooperation.



**Signed by Carlene Wyche**
Mon Nov 29 2021 10:34:34 PM EST
Key: 8D521C54; IP Address: 71.246.18.231

**Signed by Brian Paule**
Tue Nov 30 2021 12:29:27 PM EST
Key: 517DCE7D; IP Address: 75.151.158.201

Carlene Wyche *(TENANT)*                    *Date*    Brian Paule *(LANDLORD OR LANDLORD'S AGENT)*                    *Date*

 

Algon Flats

# RESTRICTED ANIMAL/BREED LIST

This Policy ("Policy") is made part of the Residential Lease Contract ("Agreement") dated **November 29, 2021**, and is between the Owner of **Algon Flats** ("Owner") and **Carlene Wyche**, (collectively and individually "Residents"), for the premises at **7810 Algon Avenue, #A201 #A201, Philadelphia, PA  19111** (the "Leased Premises"), which is located within **Algon Flats** (the "Residential Community"). All capitalized terms used but not defined herein shall have the meaning set forth in the Agreement. Where the terms and conditions of this Policy vary or conflict with the terms and conditions of the Agreement, the terms and conditions of this Policy shall control.

1. **DOG BREEDS:**     Restricted breeds that may not visit or be maintained in the Leased Premises include, but are not limited to, the following: ☒ Pit Bulls  ☒ Rottweilers  ☒ Presa Canario  ☒ German Shepherds  ☒ Huskies  ☒ Malamutes ☒ Dobermans  ☒ Chowchows  ☒ St. Bernards  ☒ Great Danes  ☒ Akitas  ☒ Terriers (Staffordshire)  ☒ American Bull Dog  ☒ Karelian Bear Dog  ☒ Any hybrid or mixed breed of one of the aforementioned breeds

2. **POISONOUS ANIMALS:**     Restricted animals that may not visit or be maintained in the Leased Premises include, but are not limited to, the following: ☒ Tarantulas  ☒ Piranhas

3. **EXOTIC ANIMALS:**     Restricted animals that may not visit or be maintained in the Leased Premises include, but are not limited to, the following: ☒ Reptiles (snakes, iguanas)  ☒ Ferrets  ☒ Skunks  ☒ Raccoons  ☒ Squirrels  ☒ Rabbits  ☒ Birds (parrots, cockatiels, macaws)

**NOTE: SERVICE/COMPANION ANIMALS MAY NOT BE SUBJECT TO THIS LIST**

INTENDING TO BE BOUND, the parties hereto have executed this Policy as of the day and year first above written.

| | |
|---|---|
| **Signed by Carlene Wyche**<br>Mon Nov 29 2021 10:34:43 PM EST<br>Key: 8D521C54; IP Address: 71.246.18.231 | **Signed by Brian Paule**<br>Tue Nov 30 2021 12:29:27 PM EST<br>Key: 517DCE7D; IP Address: 75.151.158.201 |
| Carlene Wyche *(TENANT)*                        Date | Brian Paule *(LANDLORD OR LANDLORD'S AGENT)*                Date |



# SMOKE-FREE ADDENDUM

This Addendum ("Addendum") is made part of the Residential Lease Contract ("Agreement") dated **November 29, 2021**, and is between the Owner of **Algon Flats** ("Owner") and **Carlene Wyche**, (collectively and individually "Residents"), for the premises at **7810 Algon Avenue, #A201 #A201, Philadelphia, PA  19111** (the "Leased Premises"), which is located within **Algon Flats** (the "Residential Community"). All capitalized terms used but not defined herein shall have the meaning set forth in the Agreement. Where the terms and conditions of this Addendum vary or conflict with the terms and conditions of the Agreement, the terms and conditions of this Addendum shall control.

Residents and Owner acknowledge that smoking negatively effects the health of the community at large and contributes to an increased risk of fire and maintenance and cleaning costs of the Leased Premises. In order to help minimize these issues, Residents and Owner agree to the following terms:

1. **Definition of Smoking:**    "Smoking" means inhaling, exhaling, breathing, or carrying any lighted cigar, cigarette, vapor smoking product, or other tobacco product or similar lighted product, including marijuana, in any manner or in any form.

2. **Smoke-Free Areas:**    Residents, Occupants, guests, or other individuals may not smoke anywhere in the designated smoke-free areas.

3. **Compliance.**    Residents must comply with the terms and provisions of this Addendum and inform all Occupants and guests of the Smoke-Free Areas. Residents shall promptly provide written notice to Owner of any incident of smoking or migrating secondhand smoke into the Leased Premises.

4. **Disclaimer by Owner.**    Owner's adoption and enforcement of Smoke-Free Areas is not a warranty or guarantee of the Residents' health, habitability, or smoke-free condition of the Leased Premises or other Smoke-Free Areas. Owner will take reasonable steps to enforce Smoke-Free Areas, however Owner is not required to take any steps unless Owner has actual knowledge or has received written notice about violations to the Smoke-Free Areas policy.

5. **Effect of Breach:**    Residents agree that the provisions, obligations, and conditions of this Addendum are reasonable and material and that a breach by Resident of any such provision, obligation, or condition constitutes a material breach thereof and may be grounds for immediate termination of the Residential Lease Contract by Owner.

6. **Complaint Policy:**    Complaints must be submitted in writing to Owner. Owner shall take the following actions upon receipt: 1) place a courtesy call to the resident that is smoking; 2) send a letter to the resident confirming the no smoking policy; 3) send a notice to perform or quit to the resident for repeated violations of the no smoking policy; and 4) if the resident fails to comply with the no smoking policy, Owner reserves the right to terminate the Residential Lease Contract.

**Violations of Owner's smoke-free policies will be considered grounds to terminate the Residential Lease Contract to the extent permitted by applicable law.**

INTENDING TO BE BOUND, the parties hereto have executed this Addendum as of the day and year first above written.

| | |
|---|---|
| **Signed by Carlene Wyche**<br>Mon Nov 29 2021 10:34:53 PM EST<br>Key: 8D521C54; IP Address: 71.246.18.231 | **Signed by Brian Paule**<br>Tue Nov 30 2021 12:29:27 PM EST<br>Key: 517DCE7D; IP Address: 75.151.158.201 |
| Carlene Wyche *(TENANT)*                                      Date | Brian Paule *(LANDLORD OR LANDLORD'S AGENT)*                       Date |

 

Algon Flats

# SMOKING, LEAD-BASED PIPES AND COMPONENTS DISCLOSURE AND CERTIFICATE OF RENTAL SUITABILITY

Address of Premises: **7810 Algon Avenue, #A201 #A201, Philadelphia, PA 19111**

## SMOKING DISCLOSURE

"Smoking" is defined as carrying, inhaling, exhaling, burning or handling of any kind of lighted pipe, cigar, cigarette, vape pen, vape mode or any other lighted, battery operated or heated smoking equipment containing any burning substance or product, including tobacco that is intended for human consumption by means of inhaling the smoke / vapor therefrom.

Tenant and all persons on the premises with the consent of tenant or under tenant's control shall comply with the smoking policy as set out below (check one):

☒ Smoking is prohibited at this property.

❑ Landlord is "phasing in" a no smoking policy for these entire premises. Tenant's dwelling unit is non-smoking, but other rented units on the premises may permit smoking until such time as landlord's no-smoking policy is entirely phased in. Neither tenant nor landlord shall be liable to the other for damage as a result of smoking by other tenants in or about the rented dwelling units other than the subject unit, except that no smoking is permitted within 25 feet of any nonsmoking dwelling unit on these entire premises.

## LEAD BASED PIPES AND COMPONENTS DISCLOSURE

Every lessee of any interest in residential property on which a residential dwelling was built prior to 1978 is notified that such property may present exposure to lead from lead-based paint that may place young children at risk of developing lead poisoning. Lead poisoning in young children may produce permanent neurological damage, including learning disabilities, reduced intelligence quotient, behavior problems and impaired memory. Lead poisoning also poses a particular risk to pregnant women. The lessor of any interest in residential real property is required to disclose to the lessee the presence or absence of any lead-based paint and/or lead-based paint hazards. In residential housing constructed prior to 1978, a comprehensive lead inspection or risk assessment, for possible lead-based paint and/or lead-based paint hazards is recommended prior to lease.

Every lessee of any interest in residential property is notified that any residential dwelling, regardless of construction date, may have a lead water service line or lead plumbing components. Regardless of the construction date, the Lessor of any interest in real property is required to disclose to the lessee the known existence of a lead water service line. You are advised to read the pamphlet containing information on lead water service lines and lead plumbing components provided at the time of entering into the lease.

You have a ten (10) day period, from the date of lease signing, during which time you may, at your expense, obtain a comprehensive lead inspection and risk assessment from a certified lead inspector. In the case of residential housing constructed prior to 1978, should the inspection reveal lead-based paint or lead-based paint hazards on the premises; or in the case of any residential housing, should the inspection reveal a lead service line or lead plumbing components, you may terminate the lease within two business days of the receipt of the inspection report, with all moneys paid on account to be refunded to you. Your failure to obtain such inspection within the permitted ten days and/or failure to terminate the lease upon a finding of lead-based paint or lead-based paint hazards or a lead service line or lead plumbing components within the two-day period will constitute a waiver of your right to conduct an independent inspection and the lease will remain in full force and effect.

You are advised that this property may have lead service lines.

For Targeted Housing (housing where there are children under six (6) years old residing):

You are advised to perform a visual inspection of all painted surfaces periodically during the term of the lease and you are advised that you may inform landlord of any cracked, flaking, chipping, peeling, or otherwise deteriorated paint surfaces.

## CERTIFICATE OF RENTAL SUITABILITY, PARTNERS FOR GOOD HOUSING AND WATER SUPPLEMENT

At the inception of each tenancy, an owner/landlord is required to provide the tenant with a Certificate of Rental Suitability, as well as a copy of the Partners for Good Housing and water supplement.

Tenants acknowledge that they have received a copy of the current Certificate of Rental Suitability, Partners for Good Housing Pamphlet and Water supplement.



✓ Signed by Carlene Wyche
Mon Nov 29 2021 10:35:05 PM EST
Key: 8D521C54; IP Address: 71.246.18.231

✓ Signed by Brian Paule
Tue Nov 30 2021 12:29:27 PM EST
Key: 517DCE7D; IP Address: 75.151.158.201

Carlene Wyche *(TENANT)*                    Date    Brian Paule *(LANDLORD OR LANDLORD'S AGENT)*          Date

On-Site

Algon Flats

# UTILITIES ADDENDUM

This Addendum ("Addendum") is made part of the Residential Lease Contract ("Agreement") dated **November 29, 2021**, and is between the Owner of **Algon Flats** ("Owner") and **Carlene Wyche**, (collectively and individually "Residents"), for the premises at **7810 Algon Avenue, #A201 #A201, Philadelphia, PA  19111** (the "Leased Premises"), which is located within **Algon Flats** (the "Residential Community"). All capitalized terms used but not defined herein shall have the meaning set forth in the Agreement. Where the terms and conditions of this Addendum vary or conflict with the terms and conditions of the Agreement, the terms and conditions of this Addendum shall control.

1. **Conservation.**     When utility bills are paid 100 percent by Owner, Residents have no incentive to conserve. This results in a waste of our state's natural resources and adds to the overhead of the property and that usually means higher rents. Utility billing saves money for Residents because it encourages them to conserve. We as Owner also have incentive to conserve because we pay a portion of the total utility bill(s) for the entire property.

2. **Repairs.**     Owner agrees to use its best efforts to repair any water and sewer leaks inside or outside the Leased Premises no later than seven (7) days after receiving written notice from Residents. Reporting water and sewer leaks inside the Leased Premises is the responsibility of Residents. Water and sewer leaks may impact the monthly water and sewer utility costs and must be reported to Owner immediately.

3. **Residents' Responsibilities.**     Residents are responsible for the payment of utilities and the billing method of metering or otherwise measuring the cost of the utility, as specified herein:

   A. **Water** service to the Leased Premises will be paid by Residents as follows:
      - ❏ Directly to the utility provider
      - ☒ Water usage bills billed by the utility provider to the Owner and then allocated to the Residents based on:
        - ☒ Flat rate of **$44.00** per month.   Billing Method: **4**
        - ❏ 3rd party billing company: _____

   B. **Sewer** service to the Leased Premises will be paid by Residents as follows:
      - ❏ Directly to the utility provider
      - ☒ Sewer usage bills billed by the utility provider to the Owner and then allocated to the Residents based on:
        - ☒ Flat rate of **$44.00** per month.   Billing Method: **4**
        - ❏ 3rd party billing company: _____

   C. **Electric** service to the Leased Premises will be paid by Residents as follows:
      - ☒ Directly to the utility provider
      - ❏ Electric usage bills billed by the utility provider to the Owner and then allocated to the Residents based on:
        - ❏ Flat rate of $_____ per month.
        - ❏ 3rd party billing company: _____

   D. **Gas** service to the Leased Premises will be paid by Residents as follows:
      - ❏ Directly to the utility provider
      - ☒ Gas usage bills billed by the utility provider to the Owner and then allocated to the Residents based on:
        - ❏ Flat rate of $_____ per month.
        - ☒ 3rd party billing company: **Monitor Data**   Billing Method: **1**

   E. **Cable TV** service to the Leased Premises will be paid by Residents as follows:
      - ☒ Directly to the utility provider
      - ❏ Cable TV usage bills billed by the utility provider to the Owner and then allocated to the Residents based on:
        - ❏ Flat rate of $_____ per month.
        - ❏ 3rd party billing company: _____

   F. **Internet** service to the Leased Premises will be paid by Residents as follows:
      - ☒ Directly to the utility provider
      - ❏ Internet usage bills billed by the utility provider to the Owner and then allocated to the Residents based on:
        - ❏ Flat rate of $_____ per month.
        - ❏ 3rd party billing company: _____

---

### UTILITIES BILLING METHOD KEY

1. Sub metering of all of:  ☒ Gas
2. Calculation of your total water use based on sub-metering of cold water.

---

 

3. Calculation of your total water use based on sub-metering of hot water.

4. Flat rate per month.

5. Allocation based on number of occupants residing in the Leased Premises.

6. Allocation based on the number of persons residing in the Leased Premises using a ratio occupancy formula:

| Number of Occupants | Occupancy Factor |
|---|---|
| 1 | 1 |
| 2 | 1.6 |
| 3 | 1.9 |
| 4 | 2.2 |
| 5 | 2.5 |
| 6 | 2.8 |

7. Allocation based on square footage of the Leased Premises.

8. Allocation based on a combination of square footage of the Leased Premises and the number of occupants residing in the Leased Premises.

9. Allocation based on the number of bedrooms in the Leased Premises.

---

4. **Billing Entity.**    For and in consideration of this section, the billing entity and payment location from which Residents shall receive monthly utility bills and as designated by Owner is: **N/A**.

5. **Other Charges.**    Residents hereby understand and agree to pay a monthly service charge of **$13.75** and other administrative fees as billed by the billing entity, which may be added to the Residents' utility bill. Additional fees include new account initialization charge of **$0.00** a final move-out bill fee of **$0.00** and a vacancy cost recovery fee of **$0.00**.

6. **Late Fees.**    Residents hereby understand and agree that payment for the utility bill shall be **5** days from the date it is postmarked or hand delivered to Residents. Residents agree to mail or deliver payment to the place indicated so that payment is received no later than the date specified on the utility bill. Residents agree that the actual cost to Owner and/or Billing Provider when Residents fail to pay the utility bill on time is difficult or impossible to ascertain, but the parties agree that Owner and/or Billing Provider does, in the event of a late payment, incur certain costs, such as additional bookkeeping and administrative charges, additional charges from the Billing Provider, costs in printing and mailing late notices, lost opportunity costs of the payment, etc. Accordingly, Owner and Residents agree that if the payment is not received by the due date, Residents shall immediately pay a late fee in the amount of **$75.00**.

7. **Returned Checks.**    Owner and Residents agree that the actual cost to Owner or Billing Provider when Residents pay the utility bill by a check or credit card which is subsequently dishonored by the financial institution, is difficult or impossible to ascertain, but the parties do agree that Owner or Billing Provider does, in the event of a dishonored payment, incur certain costs, such as additional bookkeeping and administrative charges, bank charges, lost opportunity costs of the missed payment, etc. The parties accordingly agree that Residents will pay a **$35.00** processing fee for each payment submitted by Residents that are returned by the financial institution for any reason, including insufficient funds and closed account. If a payment submitted by Residents is in fact returned, Owner reserves the right to require that all future payments by Residents be tendered by Certified Check or Money Order. The return payment processing fee shall be added to any utility bill in addition to the foregoing late charges for payments returned due to insufficient funds.

8. **Payments.**    Payments received will be applied to outstanding balances first. To the extent provided by law, any unpaid utility service and related charges for utilities at the time of move out from or transfer within the property may, at discretion of the Owner, be deducted from the security deposit being held by Owner.

9. **Failure to Pay.**    It is understood and agreed between the Owner and Residents that, in the event that payment is not made when due, it shall be considered a default for non-payment of rent under the Residential Lease Contract. Residents agree that the Owner may bring summary proceedings for eviction as if rent were not paid. When Residents move from the property, the water, sewer and trash charges must be paid through the move-out date. Final bill will be estimated and due as of the move out date.

10. **Change of Terms.**    During the lease term or any renewal period, Owner is authorized to bill Residents for, and Residents hereby agree to pay, a portion of the monthly bills for the utilities for the Residential Community as stated above. Owner shall give Residents at least thirty (30) days written notice before requiring Residents to commence paying for any change, including but not limited to change in billing entities, methodology, service charges, or other conditions in the manner or method of allocation of utility costs.

11. **Collection Agency.**    Residents acknowledge that Owner may turn over Residents' account to a collection agency in the

---

 

event that Residents fail to pay utility bills on time, and in such event, Residents agree to pay the service fees that are charged to the Owner by the utility billing provider or collection agency for collection activities.

**12. Limitation of Liability.**    Owner shall not be liable for any losses or damages that result from outages, interruptions, or fluctuations in utilities provided to the Leased Premises, unless such loss or damage was the direct result of the willful conduct or gross negligence of Owner or Owner's agents relating to such outages, interruptions or fluctuations. Residents hereby waive any and all claims for offset, rent reduction or diminished value of the Leased Premises due to such outages, interruptions or fluctuations.

**13. Billing Method.**    Allocation formulas will calculate your allocated share of the utility services in accordance with state and local laws. Allocation billing will be adjusted with adjustments in usage and billing rates.

**In the event of a conflict between any provision in this Special Provision section and this Addendum or the Agreement, the provision in this Special Provision section shall control.**

- **1. Water/Sewer is a flat rate that will be billed to the residents based on the number of bedrooms in the unit. $24.00 for a studio, $35.00 for 1 bedroom and $44.00 for 2 bedroom. 2. Gas service in Building "B" only for heat.**

INTENDING TO BE BOUND, the parties hereto have executed this Addendum as of the day and year first above written.

| Signed by Carlene Wyche | Signed by Brian Paule |
|---|---|
| Mon Nov 29 2021 10:37:02 PM EST | Tue Nov 30 2021 12:29:27 PM EST |
| Key: 8D521C54; IP Address: 71.246.18.231 | Key: 517DCE7D; IP Address: 75.151.158.201 |

Carlene Wyche *(TENANT)*                    *Date*    Brian Paule *(LANDLORD OR LANDLORD'S AGENT)*        *Date*

